(No. 39107.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WALTER DEFRATES, Plaintiff in Error.

*Opinion filed September 28, 1965.*

ALAN MASTERS and RICHARD H. DEVINE, both of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and WILLIAM MARTIN and ELMER C. KISSANE, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

After a bench trial in the criminal court of Cook County, the defendant, Walter DeFrates, was found guilty of rape and sentenced to the penitentiary for a term of 10 to 25 years. The appellate court, with one justice dissenting, affirmed the judgment of conviction, (53 Ill. App. 2d 277,) and we have granted defendant's petition for leave to appeal. The critical issue is whether the proof establishes beyond all reasonable doubt that an act of sexual intercourse was forcible and against the will of the complaining witness.

Defendant was a heating and air conditioning engineer who, on at least six occasions between October, 1961, and April 12, 1962, had been in the family home of the prosecutrix to service equipment. It appears that a familiarity with the prosecutrix and her husband was established beyond what would normally be expected to arise from the relationship, and that defendant, for some reason or other, submitted a bill only for the first call he made in October, 1961. During the first week of April, 1962, he was asked by the husband of the prosecutrix to adjust some fans, but this work had not been done when the husband went away on a business trip which extended through April 12. Remaining home alone were the prosecutrix and three daughters, aged eleven, ten and eight years. According to the prosecutrix she received a telephone call from defendant at about 2:45 A.M.

on the morning of April 12, and he stated that he had just made another call in the vicinity and was coming over to make the service call her husband had requested. She said that she told him her husband was not home and sought to dissuade him, but that defendant insisted upon doing the work then. After defendant had hung up, prosecutrix testified that she took off her pajamas, and put on underpants, a brassiere, a slip, shoes, and a "brunch" coat which extended below her knees.

When defendant arrived at the residence about 3:00. A.M., he was admitted by the prosecutrix, and there was agreement that he first inspected heating equipment in various parts of the house in the company of the prosecutrix, and that he then requested and was given a drink of liquor by the prosecutrix in the kitchen, though she stated she did so reluctantly and only after defendant had insisted he was cold. Continuing her testimony, the prosecutrix testified that defendant returned to the kitchen after having been in the basement, and put his arms around her and asked for a kiss, a request that was first denied but subsequently granted when defendant inquired if he would have to use force and started choking her until she could not breathe. Defendant then proposed sexual intercourse and, when this proposal was refused, he took her by the shoulders and "marched" her to the basement. There, when he ordered her to take her dress off, she did so and also removed her underclothing with defendant's assistance. At this time defendant gave her a choice of committing the sexual act either on the basement floor or "up in the bed," whereupon she chose the latter, but stated she "was not marching through this house nude with the children awake." Defendant then allowed her to put on her house coat and once again took hold of her shoulders and "marched" her from the basement to her bedroom where, on his order, she removed her house coat and got into bed.

They remained in the bedroom until 5:45 A.M., or for

approximately two hours. Prosecutrix testified there was an initial act of vaginal intercourse which was accomplished only after defendant had inquired: "Do I have to force you again?," and had ignored her pleas that she was suffering from and being treated for a vaginal condition which caused her great pain. Later, over her protests, she said that defendant subjected her to an act of anal intercourse and to a second act of vaginal intercourse. She testified that when she "screamed into the pillow" during the anal intercourse, defendant said: "Shut up or I'll beat you up." In the intervals betwen these sexual activities, defendant talked about a wide variety of subjects, and as he did so kept one leg locked over the body of the prosecutrix and an arm over her chest, exerting pressure whenever she tried to arise. Shortly before 5:45 A.M., according to the prosecutrix, she left the room on the pretext that she wanted to shut off the children's alarm clocks before they rang. Instead, she awakened the three children and ran with them to the house of a nextdoor neighbor where they were admitted once the neighbors were aroused. About 7:00 A.M. the police were called and at their suggestion the prosecutrix was sent to a hospital for examination.

Defendant's version of the incident and the background leading to it was entirely different. He testified that he had been a frequent visitor at the home after October, 1961, both socially and in a business capacity, and that after his second visit he had been intimate with the prosecutrix on numerous occasions. His business made service calls on a 24-hour basis and he stated that when he had returned to his office about 3:00 A.M. on the morning of April 12, he was given a list of calls and told that the prosecutrix had called several times since midnight. He said that he telephoned her and complied with a request that he come over; that he checked a heating unit that was vibrating; and that he had a few drinks in the kitchen, after which he and the prosecutrix started "fooling around" and then went to a

bedroom. Defendant denied that he had used force, or that he had committed unnatural acts, but testified that he had engaged in two acts of sexual intercourse with the consent and co-operation of the prosecutrix. He said that he then fell asleep until 5:45 A.M., at which time he was awakened by the prosecutrix who told him it was daylight and that he should get out of the house, whereupon he dressed and left in his car which had been parked in the driveway.

For the People, the oldest daughter testified that she had been awake when defendant was in the house, that she had seen him with her mother near a thermostat located just outside her bedroom door, and also that she had seen defendant with his hands on her mother's shoulders as they went into the mother's bedroom. With respect to the testimony of this witness, the prosecutrix testified that defendant had spoken to the daughter when he went to check the thermostat immediately after his arrival at the house. Defendant agreed that he had spoken to the girl, but stated that he had done so as he and the prosecutrix were on their way to the bedroom, the only time he was on the upper floor. A police officer, who had responded to the original call, told of seeing a spot on the prosecutrix's neck, while the next-door neighbor told of being awakened about 6:00 A.M., of finding the prosecutrix and her children at the door, and of her distraught condition and immediate complaint of rape. For the defense, an employee of the heating company testified that prior to 3:00 A.M. on the morning of April 12, a woman had telephoned for defendant at least six times.

Where, as here, the charge is forcible rape, it must be proved beyond a reasonable doubt that the act of intercourse was performed forcibly and against the will of the complaining witness. And while useless or foolhardy acts of resistance are not necessary, if the prosecutrix has use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against

her will. (*People* v. *Faulisi,* 25 Ill.2d 457, 461; *People* v. *Qualls,* 21 Ill.2d 252.) Voluntary submission by the female, while she has the power to resist, no matter how reluctantly yielded, amounts to consent and removes from the act an essential element of the crime of forcible rape. *People* v. *Scott,* 407 Ill. 301, 306.

In apparent recognition of the fact that the evidence shows no outcry or attempt to escape, and little, if any, physical resistance on the part of the prosecutrix, the People seek to justify these failures on the grounds that she was paralyzed by fear for her own safety and that of her daughters, and that she was so remote from human help that an outcry or attempt to escape would have been futile and unavailing. While there may be some basis for the latter argument, there is nothing in the evidence which supports the conclusion that the prosecutrix was gripped by a paralyzing fear. So far as the children are concerned there is no proof that defendant threatened them or evidenced any intention of harming them, and the testimony of the prosecutrix herself is devoid of any suggestion that her conduct was motivated by thoughts for the safety of the children. To our minds her election to have intercourse in a bed rather than the floor, her indignant remark that she would not parade nude through the house, and the fact that she walked from the basement to the bedroom is not the demeanor of one paralyzed by fear. What is more, it is difficult to conceive that such a fear would have consumed her for the entire two hours that was spent in the bedroom before she allegedly perpretrated a ruse to escape.

Considering the record as a whole, we are constrained to say that the testimony of the prosecutrix is not sufficiently convincing to lead to an abiding conviction of guilt, and was such that it required corroboration by some other testimony, fact or circumstance. (*People* v. *Faulisi,* 25 Ill.2d 457, 463; *People* v. *Hiller,* 7 Ill.2d 465, 470.) The prosecutrix testified that she was being treated for a vaginal in-

fection which gave her great pain, and the People argue it is inconceivable that she would have consented to sexual intercourse. Yet, no medical testimony was offered to corroborate this fact. Again, it appears that the police sent the prosecutix to a hospital for an examination, but no medical testimony was introduced to show its results. Instead, the prosecution relied solely on the testimony of a police officer that he saw a spot on the prosecutrix's throat. And while the opinion of the appellate court describes the spot as a "bruise," there is nothing in the record to support that conclusion.

We are not unmindful that the prosecutrix made an immediate complaint of rape to her neighbors; however, the events which preceded it cause the complaint to lose much of its weight. Further, it may as well be accounted for by a belated sense of guilt occurring when a dalliance unintentionally extended into the daylight hours and the prosecutrix felt the need to explain the presence of defendant's auto on the driveway and his departure from the home in case they had been observed. In this regard, the prosecutrix testified that defendant's car was gone when, immediately after her complaint, the wife of the neighbor looked out the window. Had defendant been in bed and undressed when the prosecutrix said she left him, we think it doubtful he could have arisen and departed within the short period encompassed by the prosecutrix's testimony.

A defendant should not be deprived of his liberty without clear and convincing evidence of his guilt. From a careful review of all the evidence we are forced to conclude that a reasonable doubt of guilt exists which will not permit the conviction to stand. Accordingly, the judgments of the appellate court and the criminal court are reversed.

*Judgments reversed.*