**People of the State of Illinois, Plaintiff-Appellee, v. Frank Evans, Defendant-Appellant.**

**Gen. No. 52,342.**

First District, First Division.

July 2, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (James J. Doherty, Assistant Public Defender, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Richard Trais, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

In a bench trial, defendant Frank Evans was found guilty of "attempt rape" (Ill Rev Stats, c 38, § 8–4). He was sentenced to the penitentiary for a term of five to twelve years. On appeal defendant contends that he was not proved guilty beyond a reasonable doubt because the testimony of the complaining witness was neither clear and convincing nor substantially corroborated, and that the evidence shows she made no effort to resist.

On October 19, 1966, the prosecutrix, Josephine Johnson, lived in an apartment at 4308 Congress Parkway with four of her thirteen children—Lavador, 14; Billy, Jr., 11; Margie Ann, 9; and David, 8. They had been watching television, and about twelve midnight she left home to purchase cigarettes. She initially went to a gas station, but not finding her particular brand available, she then went to a tavern, Mickey's 400 Club, where she purchased cigarettes and left. Defendant followed her home and entered her apartment four times in the early morning hours of October 20, 1966. Mrs. Johnson testified that on the third of these occasions the defendant attempted to rape her. Defendant maintains that he had been drinking at the tavern with Mrs. Johnson most of the previous evening and into the early hours of the morning and had escorted her home primarily for the purpose of hanging a mirror, but also because of Mrs. Johnson's offer of prostitution.

Mrs. Johnson testified that after she purchased the cigarettes at the tavern, defendant followed her out of the tavern and asked her to return with him to have a couple of drinks. She refused, and he followed her home. She had difficulty unlocking the door of her first-floor apartment and when she finally did so, the defendant "pushed right in on me" into her living room, threw her on the floor, and announced he was going to have intercourse with her. As she was fighting with him, he

39

bumped her head on the floor, and she started screaming for her daughter Lavador. She stated, "All my kids got up out of bed and ran in there. Lavador picked up a statue and hit him on the top of the head with it. Billy hit him first with his fist and picked up an iron pipe. I picked up my end table and hit him on the side of the head. He was kicking; he threw one of my cocktails [table] back at me and then he ran out the door. He started kicking on the door, screaming, 'Throw me my sweater and hat out.' I called the police officer. Later I threw his sweater and hat out of the window. The police arrived; I had a conversation with them. After they left he threw a two by four through my window. I looked out the window and he was going down the street. The man who threw the two by four through my window is in the courtroom—the second man with the mask on his face [for health purposes defendant wore a mask in court]. He is the man I saw running down the street. After that happened, I called the police officer again. The police came; I had a conversation with them, and they left my premises. Then I sat on my couch. I dozed off and went to sleep. Billy Jr. was in the room with me, on the floor by me on the rug. The next thing I remember, I felt something on my neck and I jumped and threw my hand up. I observed this man with the mask on had a knife on my throat. When I threw my hand up the knife cut my ear and he put the knife back on my throat and told me I'd better not scream or else he would kill me. He said, 'Get up off the couch and walk into the bedroom.' I told him I couldn't get up with the knife on my throat. He said, 'You better get up.' So then I got up. He walked me to my bedroom with the knife at my throat."

At defendant's command, and with a knife at her throat, she removed most of her clothing and lay on the bed. "As I lay down he fell right on top of me, with the knife still on me. I did not scream at this time. He didn't rip my clothes. He didn't make any bruises on my face

or arms. . . . He still had the knife on me, but it didn't cut me. I don't know how long I was in the bedroom with him. It wasn't too long before my children came in screaming. He was still on top of me. He attempted to place his penis in my vagina. I wasn't fighting him at that time. I didn't scream." Defendant was about to commence intercourse "when my kids began to scream and holler and my daughter Lavador said she was coming in the room and leave my momma alone. He said, 'If that girl comes in this bedroom I am going to kill you and your kids too.' I pleaded with him and asked him not to bother my children, that I would do anything he said if he would just let me get up and talk my kids back to bed. He said if I tried anything he would kill the children and myself. I told him I wasn't going to try anything if he'd just please not bother my children; that I'd do anything he said when I had gotten the kids back to bed. He took the knife off my throat. I leaped off the foot of my bed and ran and pushed my kids out through the back door."

Together with the four children, the prosecutrix ran through the yard and a neighbor called the police. "After that Lavador and I returned to the house. The other children I left with the man by his station wagon. When I returned to the house I searched it as I went through and I locked my doors. I looked up in my front door and there that gentleman with the mask was right back there again. I walked to my front window, which was broken, looked out, saw the police officer coming and hollered out to him, 'There is the man.' The defendant was right in my front door." Defendant was arrested and searched, and two knives were taken from his person, one of which the prosecutrix identified as "my butcher knife."

Lavador, Mrs. Johnson's 14-year-old daughter, testified that Mrs. Johnson had been home all evening and later left to buy cigarettes. Subsequently she heard her

mother call her name and, on entering the living room, saw Mrs. Johnson and the defendant struggling on the floor. Lavador and the other three children began striking defendant. Lavador left the room and returned with a knife (People's Exhibit 2) and gave it to her mother. Mrs. Johnson was in the living room, and defendant had already run out of the door. The police came and then left. The defendant left a hat and a pink sweater in the house, and her mother threw them out of the window. Then a two by four was thrown through the window, and she saw defendant run. The police were called again and left. Lavador and her sister went to bed, and she told her brothers to stay in the front room because her mother went to sleep on the couch. David went back to bed, but Billy, Jr., stayed with her mother.

Later, Billy came into her room and awakened her. The four children went into the kitchen, and Lavador stated, "I gave Margie and David a milk jug and Billie that pipe of the divider. And I had a chain and a hammer. Then we went back into the front room. I observed some blood on the arm of the sectional couch." They opened the door to her mother's bedroom, and the light was off. "We couldn't see anything in the room. I heard somebody say, get away from that door. . . . My mother came out of the room. She had on a blouse and her slip. She didn't have her shoes on. She told us to run out the back door." The four children and Mrs. Johnson ran to a neighbor. Later Lavador and her mother returned to their home. Defendant returned and was arrested.

Billy, Mrs. Johnson's 11-year-old son, testified that she went out for cigarettes about midnight. He corroborated the testimony of his sister and mother and identified People's Exhibit 2 as the family kitchen knife.

Another witness for the State, Police Officer John Grimes, described the arrest of defendant in the early morning hours of October 20, 1966, on the steps of 4308 West Congress. Defendant was taken back into the house,

where the victim and her children were all screaming. Two knives were found on the defendant.

Defendant testified that he was at Mickey's 400 Club on October 19, 1966, from 6:00 p. m., and he met Mrs. Johnson in the tavern early in the evening. They drank heavily together for a number of hours. "I would say we were both intoxicated. We left the tavern at five minutes to two o'clock. They put us out." During the course of the evening Mrs. Johnson had suggested prostitution to the defendant and also asked him about hanging a mirror in her apartment. After leaving the tavern, they went to Mrs. Johnson's apartment, and her daughter let them in. After drinking for awhile, Mrs. Johnson mentioned money to the defendant. When defendant started to leave because Mrs. Johnson did not show him the mirror, Mrs. Johnson grabbed him, they struggled and fell to the floor, and "her kids came running and one of them hit me on the head with something. The other kid hit me on my back. I did not force my way into her door. I did walk in with her. She invited me into her house. I never followed her from the tavern. I walked with her." He returned four times. The first time he returned to get his sweater, which was given to him. The second time he returned to toss a two by four through the window, because of his anger over being rudely treated after being invited into the apartment. The defendant then went to a restaurant on Madison Street and ate bacon and eggs or rib tips at about 3:30 or 4:00 a. m. The third time he returned to the apartment the door was open, and he entered. Mrs. Johnson was lying on the couch, and her son was lying on the floor next to her. Defendant shook her and said, " 'Why did you and the kids jump on me?' I said, 'I come to see if I could put the mirror up for you that you wanted to put up, and about the other thing, I didn't go that way, I said, if I want something, I have a girl I can go to.' I was just explaining this was a business

43

deal. She didn't say anything. She got up off the couch and went to her bedroom and said, 'Come behind me.' She started pulling off her clothes voluntarily. . . . I did not take a knife out of my pocket while I was in there the second time." The door to her bedroom was open, and the lights were off. Mrs. Johnson removed part of her clothing and lay on the bed, and "by that time, the kids started, 'Leave my mother alone.' She said, 'I will go and talk to the kids.' Next thing I knew she had run out through the back. I got up and left. . . . I waited by the next building because I wanted to talk to her. Because I wanted to see if she wanted the mirror put up." After waiting about ten minutes, he saw them coming back to the house and went over to talk to them, and while trying to talk to her, "she hollered, 'There he is, he is the one.' " Defendant was then arrested and taken to the police station.

A witness for the defense, Edward Pickens, testified he was an old friend of the defendant. He saw defendant in Mickey's at about 6:45 p. m. He saw Mrs. Johnson come into the tavern between 8:00 and 8:30. She was drinking at the bar, and defendant was talking to her when Pickens left "about a quarter to nine."

Another witness for the defense, Gail Randall, testified that she was a barmaid at Mickey's. On the night of October 19, 1966, defendant entered the tavern between 6:00 and 7:00 p. m. Shortly thereafter, Mrs. Johnson entered, and she and defendant were in the tavern together for the entire evening. They were both intoxicated by the end of the evening, and at about 2:00 a. m. they were ejected because Mrs. Johnson was cursing and bothering the bartender.

In finding defendant guilty, the trial judge remarked: "The defendant is guilty beyond a reasonable doubt. That is it. There is absolutely no doubt at all. What to do about a case like this is to fight back temptation of the person. He did that by getting on the stand, telling a

44

ridiculous story. I am going to overcome that temptation. You got on the stand and told a story that is absolutely preposterous. And he knew it was preposterous when he told it."

Defendant asserts that "the crucial question in this case is whether Mrs. Johnson was assaulted in her bedroom by a stranger who followed her home, or whether she entered the bedroom after spending a considerable amount of time with that individual during the course of the evening in a tavern and later for a period of about a half hour in her own living room. The testimony by the prosecutrix is contradicted not only by the barmaid and a patron of the tavern, but by prosecutrix's own statement to the police on the evening in question. The preponderance of the evidence indicates that on the evening in question, Mrs. Johnson and defendant met and drank together in a tavern; that Mrs. Johnson became intoxicated and was ejected from the tavern because of such intoxication; that the couple proceeded together to Mrs. Johnson's apartment where they sat together drinking and quarreling about money; that Mrs. Johnson and her children insisted defendant leave the premises at that time; that defendant, confused and angry, returned to the apartment later that same morning on three different occasions; that on the second of those occasions defendant was in the living room with prosecutrix and her son for about half an hour before accompanying Mrs. Johnson to her bed; that the other four occupants of the apartment knew of this situation and made no attempt whatsoever to obtain assistance on their mother's behalf. The only conclusion one can reach is that defendant is not guilty of attempting to compel the prosecutrix to submit to an act of sexual intercourse by force and against her will."

Defendant further argues that it is the obligation of the State to show that the act of attempt to rape was committed by force and against the will of the female, but

45

in the instant case the prosecutrix testified on cross-examination that she herself removed her clothing in the bedroom and lay down on the bed, and that she made no attempt to fight the defendant or to scream for help, and "as explanation for her lack of resistance, prosecutrix testified that she was afraid to fight back because defendant had a knife on her neck. . . . There is absolutely no substantial evidence or corroboration to indicate that the act complained of was committed by force and against the will of the prosecutrix."

The State maintains that the testimony of the prosecutrix was clear and convincing and sufficiently corroborated. The State asserts that the prosecutrix testified consistently on both direct and cross-examination that (1) she was awakened during the early morning hours of October 20, 1966, by the defendant, who was holding a knife on her neck; (2) the defendant told her not to scream and ordered her into the bedroom; (3) the prosecutrix continuously pleaded with the defendant to take away the knife; (4) she was forced to remove her clothes at knife point; (5) he (the defendant) attempted to place his penis in her vagina when the children came into the bedroom screaming; and (6) the prosecutrix and her children then ran out of the house and immediately summoned help.

The State contends that the defense witnesses, Pickens and Randall, were confused as to dates, and their testimony was conflicting and unreliable. The State asserts that the testimony of defendant was simply unbelievable, and "there was no duty upon the court to believe the defendant's explanation (or the testimony of his witnesses) for when a 'defendant elects to justify or explain his presence at or near the scene of a crime, while denying participation, he must tell a reasonable story, or be judged by its improbabilities.' " People v. Spagnolia, 21 Ill2d 455, 458, 173 NE2d 431 (1961).

The State argues that the totality of the circumstances surrounding the attempted rape indicates the complete failure of the defendant, despite many attempts, to establish any relationship with the prosecutrix save that of an intruder and an attempted rapist.

We believe the following authorities supply the guidelines to be applied here:

People v. Stagg, 29 Ill2d 415, 421, 194 NE2d 342 (1963):

> "In a prosecution for the crime of assault with intent to rape the testimony of the prosecutrix alone, if clear and convincing or if substantially corroborated by some other fact, evidence or circumstance, is sufficient to convict. . . . And the credibility of witnesses is ordinarily a matter exclusively for the jury to determine. . . . However, this rule does not preclude a reviewing court from in all instances considering the question of credibility of witnesses, particularly where a sex crime is involved where it is relatively easy to accuse even reputable persons and sometimes difficult to become disentangled from so heinous an imputation. Therefore, where, as here, the testimony of the prosecutrix alone is relied upon for a conviction, that testimony must be clear and convincing, and if it has been impeached, is inherently improbable, or is such that reasonable minds could not believe it, the conviction must be reversed."

People v. DeFrates, 33 Ill2d 190, 194, 210 NE2d 467 (1965):

> "Where, as here, the charge is forcible rape, it must be proved beyond a reasonable doubt that the act of intercourse was performed forcibly and against the will of the complaining witness. And while useless or foolhardy acts of resistance are not necessary, if

the prosecutrix has use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will. . . . Voluntary submission by the female, while she has the power to resist, no matter how reluctantly yielded, amounts to consent and removes from the act an essential element of the crime of forcible rape."

At p 196:

"A defendant should not be deprived of his liberty without clear and convincing evidence of his guilt. From a careful review of all the evidence we are forced to conclude that a reasonable doubt of guilt exists which will not permit the conviction to stand."

People v. Mack, 25 Ill2d 416, 420, 185 NE2d 154 (1962):

"Where we have reversed cases because of failure to corroborate the testimony of the complaining witness, we have done so not because of any fixed rule requiring corroboration but because, upon the state of the record in the particular case, the evidence left a reasonable doubt as to the guilt of the defendant."

People v. Kepler, 76 Ill App2d 135, 141, 221 NE2d 801 (1966):

"[T]he charge of rape is an accusation easily made, hard to prove, and even harder to be defended against by the accused. . . . A reviewing court will not hesitate to reverse a conviction where, after a review of all the evidence, there exists a grave and substantial doubt as to the guilt of the defendant due to a lack of credible evidence or the existence of improbable or unsatisfactory evidence."

After a careful scrutiny of the evidence upon which defendant's conviction rests, we conclude the testimony

48

of the children is believable and corroborative of most of the events which occurred at their home, and which were substantially admitted by the defendant. Their testimony presented a pathetic situation of children frantically trying to protect their mother from harm. However, we think there exists a "grave and substantial doubt" that defendant's attempt at sexual intercourse was performed with force and against the will of the prosecutrix. The testimony of the prosecutrix presents a fantastic and incredible sequence of events, commencing with her midnight quest for cigarettes of her special brand, which led her to a tavern which she had never been in before, and concluded with attempted rape by a "stranger" who had "followed her home." We agree with the trial court that defendant told a ridiculous story, but we believe the same observation applies to the testimony of the prosecutrix. We think it is reasonable to infer that the conduct of defendant was not that of a complete stranger, and that his activities were the result of some invitation extended to him by the prosecutrix earlier in the evening. Although his testimony reflects untruths, the testimony of the prosecutrix, standing alone, is not clear and convincing and is so inherently improbable that reasonable minds could not believe it. There is no corroboration of the material elements of force and lack of consent. People v. Qualls, 21 Ill2d 252, 171 NE2d 612 (1961).

■ ■ Although great weight is attached to the findings of the trier of the fact, including his appraisal of the credibility of the witnesses, they are not conclusive, and it is our duty to set a conviction aside where the evidence is so unsatisfactory as to raise a reasonable doubt of defendant's guilt. In our opinion, the totality of the circumstances here leaves a reasonable doubt of the defendant's guilt and fails to create an abiding conviction that he is guilty of the crime charged. People v. Reese,

34 Ill2d 77, 80, 213 NE2d 526 (1966) ; People v. Hubbard, 38 Ill2d 104, 111, 230 NE2d 220 (1967).
Therefore, for the reasons given the judgment of the Circuit Court of Cook County is reversed.

Reversed.

ADESKO, P. J. and BURMAN, J., concur.