THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EDWARD S. REED, Defendant-Appellant.

First District (2nd Division)   No. 77-659

Opinion filed February 7, 1978.—Rehearing denied March 3, 1978.

534

Sam Adam and Alan D. Blumenthal, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PUSATERI* delivered the opinion of the court:
Defendant, Edward S. Reed, was found guilty of rape, three counts of deviate sexual assault and one count of unlawful restraint (Ill. Rev. Stat. 1975, ch. 38, pars. 11—1, 11—3 and 10—3) after a bench trial in the circuit

_____
* This opinion was prepared by Mr. Justice Pusateri and was adopted prior to his resignation.

court of Cook County. He was sentenced to four concurrent terms of 4 years to 4 years and a day for rape and the three counts of deviate sexual assault and to one concurrent term of 1 to 3 years on the unlawful restraint charge. The issues for review are whether defendant was proved guilty beyond a reasonable doubt and whether his appointed trial counsel was incompetent.

The complainant testified at the time of the incident she was 19 years old, a student at the Art Institute of Chicago and was living with her aunt in Hyde Park. On April 23, 1976, she received a telephone call from defendant, who identified himself as Dr. Reed and told her he was an acquaintance of her best friend, whom she knew in high school in North Carolina and was at that time attending art school in Atlanta. Defendant told her he was a doctor in Atlanta, was divorced and had come to Chicago to visit his children.

On April 25, 1976, defendant telephoned again and made arrangements to take her to dinner. That evening, defendant, who was 49 years old, and his son picked up the complainant at her aunt's house, and then went to the lounge at the 50th On The Lake Motel where she had two drinks. Defendant's son made a telephone call and then left.

Defendant told her he was a psychologist and that her friend had mentioned the complainant had sex problems. The complainant thought it unusual her friend would make such a remark and told defendant she had no problems. She explained to defendant that she had high priorities and she would want to love and respect someone before giving herself sexually. At trial she stated she had not had sexual relations prior to that time.

They then talked about her school and about the fact that she was tired and tense trying to finish her work. Defendant told her he knew about a method of massage which could relieve tension and make her feel better. He stated the massage required that both of them be nude. She inquired if there were any sex involved, and defendant said no. He then encouraged her to go someplace where he could give her the massage. When complainant asked if he had an office or a place where they could go, defendant told her he had an apartment he was renting while in Chicago. On cross-examination she stated there might have been talk about going to a motel, but they mutually agreed on his apartment.

They left the lounge and first drove to an apartment where he said his former wife lived because he needed to pick up some things. When they got to his apartment, they walked up the back stairs to the third floor, and she saw lights on in other apartments. Upon arriving in defendant's apartment, she asked him to tell her about the massage technique, but he declined and said they would just go ahead and do it. She went into the

bedroom and voluntarily took off her clothes and put a blanket around herself. When she looked up she noticed that defendant had also disrobed.

Defendant told her to lie on the bed and he would give her the massage. He started at her head and massaged the entire front of her body including her breasts. She thought he knew what he was doing because she felt relaxed. He then told her to massage him, that it was part of the relaxation technique. She massaged his back, but he told her she was not doing it right, and he began to show her again how it was done, with her lying on her stomach. She stated he became rough, slapped her on the buttocks, and told her to turn over and close her eyes. When she had done that, he placed his finger and mouth on her vagina. She pushed him away and yelled at him to stop, but he pushed her down and again put his mouth on her vagina. She told him to leave her alone, but he refused. She begged him to let her go to the bathroom, and he acquiesced; she did not recall whether or not there was a lock on the bathroom door.

After about 2 minutes she came out and told him she was going to get her clothes and leave, and defendant said she could not. She picked up a mop and told him to get out. He stated she was not going anywhere and locked the door. She went into the bedroom and started to pick up her clothes, but he grabbed the mop from her and threw her on the bed. She rolled over to the opposite side of the bed and screamed out the window. Defendant put his hands over her mouth and told her not to scream "or else." He threw her down on the bed once more, and despite her efforts to fight against him, he began having intercourse with her.

When he got off her she tried to kick him in the crotch with her foot but failed, and he slapped her under the chin. He grabbed hold of her and told her it looked as if she was "going to be a hard one." He made her spread her legs apart and told her not to move. When she moved her left leg, he hit it with his fist, and then placed a sheet over her entire body. She threw it off twice complaining she could not breathe, and he yelled at her to leave the sheet on. He then tied a towel around her head and yanked it tight behind her, and she then heard him going through the case that he brought with him. When he sat between her legs, she begged him not to kill her.

Defendant then placed a vibrator in her vagina for about 2 minutes after which he again began intercourse with her. She stated she tried to fight but then stopped. Defendant then assaulted her anally with the vibrator and with his penis for a period of about 10 minutes after which he grabbed her by the hair and forced her to commit an act of fellatio.

Defendant once again engaged in intercourse with complainant and he remained in that position until he fell asleep. She twice tried to get away, but defendant awoke each time and prevented her from leaving. She then

fell asleep for a period of 15 minutes or longer. Upon waking she dressed and left the apartment at 4 a.m. without disturbing defendant.

She tried to get a taxi but there were none available. However, two men stopped in a car and asked if she was in trouble. After a conversation they took her to Henrotin Hospital.

The complainant stated that when defendant struck her on the chin it caused a red mark which later turned into a bruise. She specifically mentioned the blow on her chin at the hospital, but did not remember which of the three doctors in the room she had made the statement to.

Regonald Lindsey, a teacher for the Chicago Board of Education, testified that he and Jesse Poncedeleonn were driving by the intersection of Armitage and Fremont at 4 a.m. on April 26, 1976, and they saw the complainant walking down the street looking disoriented and lost. Her coat was not on too well, her face was red and she looked as if she had been crying. He opened the car door and asked if she needed a ride, but she did not say anything. When he asked if she needed help, she walked over to the car and got in. At this time she stated she had been raped, and they drove her to Henrotin Hospital.

Jesse Poncedeleonn testified that when he first saw the complainant she looked troubled and lost, and her clothes were in disarray. When she got in the back seat, he could see her face was red and looked as if she had been hurt. When Lindsey asked her what had happened, she stated she had been raped.

Doctor Lawrence Highman, a physician at the Henrotin Hospital emergency room, testified he examined the complainant. She told him she had been assaulted several times by a man in his apartment, and she appeared to be emotionally upset. Upon examining her he found areas of redness and tenderness on her left thigh and on her left upper arm. He also stated there was a laceration in her vaginal area of recent origin which was painful, and he characterized it as a significant tear, two centimeters in length. He stated that it was the first time he had seen one in this location in someone not in childbirth and stated it usually occurred with a significant stretching of the skin. He also stated the hymen was not intact but he could not offer an opinion of whether she had been a virgin prior to the incident in question. He noticed no other trauma to the vaginal or rectal areas.

Officer Tranckitello testified he arrested defendant on April 26, 1976, in his apartment at 6:15 a.m. When he arrived, the back door was already open, and defendant was in the bedroom asleep, lying naked in bed; there was a phallic-shaped vibrator on the night table next to the bed. He awakened defendant and advised him of his constitutional rights, and defendant stated that he understood them. Defendant said that complainant had gone with him to the lounge and they had a conversation

during which he deduced she had a problem, and she agreed to come to his apartment for the purpose of his administering sex therapy. He admitted engaging in acts of sexual intercourse and cunnilingus, but stated the sexual acts were a part of his therapy which he knew complainant needed because of his experience as a doctor. He stated he had used the method before on many occasions, and the complainant had consented to the acts.

Defendant made a motion for a finding at the close of the State's case, which the court denied after extensive arguments. Defendant then rested without presenting evidence. After closing arguments the court found defendant guilty on all counts and entered judgment.

■■ In *People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865, the court summarized the law with respect to the use of force in rape cases. The court reiterated that reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases, and it is the duty of the reviewing court not only to consider the evidence carefully but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that he is guilty of the crime charged.

■■ The degree of force exerted by defendant and the amount of resistance on the part of the complainant are matters that depend upon the facts of the particular case; resistance is not necessary under circumstances where it would be futile or would endanger the life of the complainant, as where defendant is armed with a deadly weapon. Proof of physical force is unnecessary if the complainant was paralyzed by fear or overcome by the superior strength of her attacker; but it is fundamental that in order to prove the charge of rape, there must be evidence to show the act was committed by force against the will of the female. If the victim had the use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will. (Also see *People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.2d 211, and *People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467.) In the case of *People v. DeFrates* the court stated the rule as follows:

> "Voluntary submission by the female, while she has the power to resist, no matter how reluctantly yielded, amounts to consent and removes from the act an essential element of the crime of forcible rape." 33 Ill. 2d 190, 195.

■■ In rape prosecutions it has also been held that although the testimony of the complaining witness is uncorroborated by other witnesses, it is sufficient to justify a conviction if her testimony is clear and convincing. However, where her testimony is not of such clear and convincing character and defendant denied the charge, her testimony

should be corroborated by other facts or evidence in the case. *People v. Reese* (1st Dist. 1973), 14 Ill. App. 3d 1049, 303 N.E.2d 814.

Defendant contends there was insufficient evidence to establish forcible rape, and he is characterized in the brief as being "a rather frail man, 49 years old". However, the record discloses he was 7 inches taller and 50 pounds heavier than the complainant.

The complainant's testimony which was unrebutted and apparently believed by the trial court was that she struggled with defendant, screamed out the window, was struck and was finally overpowered by defendant. She also stated she feared for her life. Her testimony established that she consented to a nude massage but to nothing more, and that testimony was corroborated either by medical findings or by other witnesses. The doctor testified there was a significant and painful laceration in the complainant's vaginal area which he had not seen in any women but those giving birth, and it was usually accompanied by a significant stretching of the skin. It is difficult to believe that the complainant would consent to an act that resulted in such an injury. Doctor Highman had also testified she had a red and tender mark on her left thigh which corresponds to where she stated defendant had struck her, as well as another such mark on her upper left arm. Although the doctor denied that she had informed him of a blow to her jaw, she testified there were three doctors in the room where she was examined, and it is possible she made the remark about her chin to one of the other two. Nevertheless, both of the men that drove her to the hospital testified that her face was red and looked as if she had been hurt.

■■ It is well settled that a prompt complaint is sufficient to corroborate the testimony of a rape victim. (*People v. Reese; People v. Putney* (3d Dist. 1971), 132 Ill. App. 2d 967, 972, 271 N.E.2d 685.) In this case the complainant was observed wandering down the street looking lost and disoriented at 4 o'clock in the morning with her clothes in disarray. Upon being asked if anything was wrong, she stated she had been raped.

It may be concluded with some justification that complainant's voluntary consent to a nude massage with no apprehension of sexual involvement was remarkably naive, but it is more understandable in the context of her art school background where nudity does not always elicit sexual responses. Complainant's actions might also be reasonably explained from the facts that defendant, who is 30 years older than she, introduced himself as an acquaintance of her best friend and indicated that he was a doctor and psychologist. These considerations apparently caused her to believe he could be trusted to respect the moral beliefs she had related to him during their conversation.

The arguments in defendant's brief amount to a suggestion that consent to a nude massage was consent to whatever followed, but there is no basis in the law for such a proposition. In the case of *People v. Wilcox* (2d Dist. 1975), 33 Ill. App. 3d 432, 436, 337 N.E.2d 211, *appeal denied*, 62 Ill. 2d 591, the complainant willingly had sexual intercourse with defendant on 4 or 5 occasions previous to the incident complained of and had been willing to engage in intercourse even on that occasion. However, when she refused to engage in an act of oral copulation the defendant beat her, tied her up, forced her to copulate orally, and committed acts of deviate sexual assault upon her after which he forced her to engage in intercourse. The trial court found defendant guilty of both rape and deviate sexual assault and concluded that forcible rape and deviate sexual assault were not what was "bargained for." The appellate court affirmed the convictions and stated that previous consent to sexual intercourse and a fair implication that the witness would have been willing even on this occasion to engage in the acts previously consented to does not give the defendant a license to forcefully require other sexual acts which the complaining witness testified were against her will. The court stated that the matter was one of credibility and from the total record was unable to say that the evidence was so unreasonably improbable or unsatisfactory as to cause a reasonable doubt to exist.

■■ The testimony of the complainant in this case was forthright, and the court apparently found her to be a credible witness. In *People v. Reese* (1973), 54 Ill. 2d 51, 57-58, 294 N.E.2d 288, the court stated that courts of review will have a special duty of carefully examining the evidence of rape cases, but in so doing the court may not encroach upon the function of the trier of fact to weigh the credibility and otherwise assess the evidence presented. A court of review will not set aside the finding of guilt unless the evidence is so palpably contrary to the finding or so unreasonable, improbable, or unsatisfactory as to cause a reasonable doubt as to the guilt of the accused. After carefully reviewing the record in this case, we find no reason to disturb the determination of the trial court.

Defendant next contends the conduct of defense counsel was incompetent. At the motion for a new trial on May 3, 1977, defendant retained private counsel to replace the assistant public defenders who represented him at trial. It was then argued that defendant had received incompetent representation at trial based primarily on the failure not to have defendant testify in his own behalf in support of his defense of consent.

However, after a hearing the court found that not having defendant testify was a strategic decision, and the record supports that determination. Counsel for defendant concluded the defense of consent

had been placed before the court when the arresting officer testified defendant admitted the acts complained of but that complainant consented to them. It is irrelevant who produces the facts at issue, and defendant's burden of production may be met either by his own evidence or by the prosecution's case-in-chief. (*Rodgers v. United States* (9th Cir. 1968), 402 F.2d 830, 834; *Notaro v. United States* (9th Cir. 1966), 363 F.2d 169, 174.) Counsel also concluded defendant would not make a good witness based on a simulated cross-examination of defendant which took place after the complainant had testified at trial. The record also suggests defendant's credibility would be in issue because he falsely had stated to the complainant and to the arresting officer that he was a doctor.

It was also the opinion of counsel that although a *prima facie* case might have been made against defendant, the evidence was not sufficient to constitute proof beyond a reasonable doubt.

■■ In *People v. Newell* (1971), 48 Ill. 2d 382, 387, 268 N.E.2d 17, our supreme court stated that a conclusion of inadequate representation can be reached only by demonstrating actual incompetence of counsel and by showing substantial prejudice; matters going to the exercise of judgment and discretion and trial tactics are insufficient to establish incompetence of counsel. (Also see *People v. Townsend* (1st Dist. 1977), 47 Ill. App. 3d 789, 793, 365 N.E.2d 110; *People v. Bouse* (1st Dist. 1977), 46 Ill. App. 3d 465, 473, 360 N.E.2d 1340.) After review of the record we find defense counsel's decision not to let defendant testify was a tactical one for which there is support in the record, and the fact that another attorney in the better light of hindsight might possibly have conducted the trial in a different manner should not be accepted as an indication of incompetency. (*People v. Virgil* (1st Dist. 1977), 54 Ill. App. 3d 682, 370 N.E.2d 74.) We conclude that defendant was not denied effective assistance of counsel.

For these reasons the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

STAMOS, P. J., and DOWNING, J., concur.