THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BRUCE RANKIN, Defendant-Appellant.
First District (2nd Division)   No. 78-19

Opinion filed June 26, 1979.

James J. Doherty, Public Defender, of Chicago (Leonard V. Solomon, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Nicholas P. Iavarone, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Defendant Bruce Rankin appeals from his conviction for rape and aggravated battery following a jury trial. In this appeal he questions the verdict upon two grounds: failure to prove his guilt beyond a reasonable doubt; and failure to appropriately consider his alibi defense.

For the reasons hereinafter stated, we affirm.

Gereta Tammara Adams (hereinafter "complainant"), a 15-year-old

high school student, testified that on the evening of May 26, 1976, she was at home, 3040 W. Cullerton Avenue, in Chicago, with her mother, Eileen Adams, her sisters Jodette and Margaret, her brother-in-law Walter Petty, and a nephew, Gregory. A few minutes after 9 p.m. the doorbell was rung by Alvin Rankin, defendant's younger brother, who told complainant that defendant, age 18, whom she had known for four years, wanted to see her. After obtaining her mother's permission to go next door where defendant lived, she knocked at the front door of defendant's house and, receiving no answer, called out his name. When no one answered, she looked up and down the empty street while standing in front of the gangway beside the house. She heard footsteps behind her and, turning around, saw defendant approaching her with a hammer. He walked up to her, twisted her right arm behind her back and clamped a hand over her mouth. Defendant warned her not to scream or fight him; when she resisted, he struck her on the head with the hammer. Still holding her arm behind her back, he then pushed her inside a doorway farthest from the street leading to his residence, and up the stairs until they reached the third floor attic apartment. Pushing open the door, he shoved complainant inside to a room furnished with a bed, a dresser, and a table supporting a television set, which was running at the time. A window facing the street was open.

Defendant locked the door and, holding the hammer, ordered complainant to undress. Initially she refused but, when defendant threatened to kill her, she removed her clothes and defendant removed his. He pushed her down onto the bed and forced her to have intercourse with him. While the rape was occurring he tried to kiss her, which complainant resisted, turning her head from side to side, and she was crying. The hammer was at the foot of the bed. When finished, defendant ordered her to get dressed. He would not release her because she would go to the police. He warned that if she did so he would kill her. Blood was coming from the right side of her head where she had been struck by the hammer. Defendant gave her an old shirt and a jar of water with which she wiped the blood away. He then had intercourse with her a second time. She again turned her head to avoid him and cried during the rape. Afterwards he fastened her clothes and removed the bed sheets bloodied by her head wound.

Complainant then heard her mother's voice calling, but she did not respond because of defendant's threats. She noticed that the 10 p.m. news was being broadcast on the television when, a few minutes thereafter, she heard Betty Rogers, a neighbor, call out. Using the name by which complainant was known to her friends, Ms. Rogers said, "Bruce, is Tammie up there?" to which the defendant replied, "No, she isn't here." He then pushed complainant down onto the bed and raped her a third

time. Thereafter defendant reminded her that he would kill her if she went to the police, unlocked the door, and with complainant walked down the stairs and left the house. After warning her again, defendant ran west down the street. Complainant then returned home and the police were summoned.

Officer John Byra testified that he received the assignment to investigate the rape complaint at about 10:45 p.m. When he arrived at complainant's house she was "* * *" crying and bleeding from the head." Finding no one home at 3038 W. Cullerton, where complainant had directed him, Byra toured the area with her in his squad car in an attempt to locate defendant, but was unsuccessful. He then took complainant to St. Anthony's Hospital, where she received stitches in her head and a pap smear was taken. Rodney Blach, a microanalyst employed by the Chicago Police Department Crime Lab, testified that he examined the slides containing the pap smear, and that the tests were "positive for spermatozoa."

Christine Menchavez testified that she was the nurse on duty in the hospital's emergency room at about 11:30 p.m. when she saw complainant. Mrs. Menchavez observed the injury to complainant's head and heard her speak of the circumstances of the rape. She later made out a report in which she wrote: "Patient states she is 6 weeks pregnant."

Eileen Adams, complainant's mother, testified that at about 10:15 p.m. that evening she sent her daughter, Jodette, outside to look for complainant at defendant's house. When Jodette returned without her, Mrs. Adams went there and called out for complainant, but no one answered. While looking for her, Mrs. Adams noticed that a light was on in the attic window of defendant's house that it went out when she called for complainant. At about 10:30 p.m., complainant returned home and said she had been raped.

Betty Rogers, who lived nearby and who had known defendant for six years, testified that she was watching a television program at about 10:05 p.m. that evening when she heard Eileen Adams call out complainant's name. Shortly thereafter, Ms. Rogers heard Alvin Rankin calling out for defendant. She had a short conversation with Alvin at about 10:15 p.m., then she called out for defendant and also spoke briefly with him.

Police Officer Richard Allen testified that on June 10, 1976, he arrested defendant at 8600 South Yates in Chicago, at which time defendant told him that he knew the police on the west side were looking for him.

Geraldine Boone, who lived nearby, testified for the defense that she saw defendant talking to a friend of her daughter's, one Leroy Brown, outside her front door a few minutes after 10 p.m. Brown testified that he was inside Geraldine Boone's house watching television with her

daughter, Carla, when he heard defendant knock on the window a few minutes after 10 p.m. Brown spoke to defendant outside.

Brian Dosch, a law student who was employed as a law clerk for the Cook County public defender, testified that he accompanied David Daniels, an attorney with the public defender's office on August 5, 1976, during an interview of complainant at her home. She responded affirmatively to a question put to her by Mr. Daniels as to whether she had ever asked defendant or he had ever volunteered " 'to take care of the child'."

The jury found defendant guilty of rape and aggravated battery. His motion for a new trial was denied and after a hearing on aggravation and mitigation, he was sentenced to seven to fourteen years for rape and three to seven years for aggravated battery, to be served concurrently.

Defendant's contention that his conviction is against the manifest weight of the evidence rests upon two arguments: that certain contradictions and improbabilities of complainant's testimony render it inadequate to support a guilty verdict; and that the testimony of Geraldine Boone and Leroy Brown raises substantial doubt of his guilt.

In support of his first argument, defendant refers primarily to two inconsistencies between complainant's trial testimony and earlier statements by her. At trial she testified that, after defendant had seized her and forced her up the stairs to the attic room, he pushed open the door without using a key; at the preliminary hearing she had said that a key was used. At trial complainant acknowledged having made the prior statement but maintained that defendant had not in fact used a key. She also admitted to having previously told Nurse Menchavez that, at defendant's order, she assisted him in effecting the rape by placing his penis in her vagina, although at trial she testified that defendant did so by himself.

■■ Such relatively minor inconsistencies in a rape complainant's testimony do not constitute grounds for reversal. (*People v. Thompson* (1978), 57 Ill. App. 3d 134, 372 N.E.2d 1052.) That case also involved a sexual assault upon a minor in which the complainant was forced to assist the defendant in executing the attack and involved variations in her subsequent accounts of what happened. The court affirmed the convictions based upon corroborative evidence, which is also present in the case at bar: a prompt complaint, emotional distress evidenced by crying, and medical evidence of a physical assault, stating (57 Ill. App. 3d 134, 140):

> "Clear and convincing evidence is not synonymous with uncontradicted or unimpeached testimony. Rather, minor variances in testimony may occur, and if so, such variances constitute mere discrepancies going only to credibility (*People v.*

*Wright* (1972), 3 Ill. App. 3d 829, 279 N.E.2d 398). Where the victim's story is consistent and such discrepancies do not detract from its reasonableness, her testimony may be found clear and convincing." (See also *People v. Utinans* (1977), 55 Ill. App. 3d 306, 315, 370 N.E.2d 1080.) By this standard the inconsistencies defendant relies upon are neither probative nor pivotal.

Defendant also questions complainant's testimony that she was too frightened to scream at any time during the abduction and rape, although she claims to have resisted him physically as he dragged her up the stairs and into the attic room. He emphasizes that she describes physical improbabilities, by reason of her claim that he was using his hands simultaneously to twist her arm behind her back, clamp her mouth shut, strike her with the hammer, push her to the door of his house, up the stairs and into the attic room, while suppressing her physical resistance. He finds it "difficult to imagine" complainant could not call for help or escape from an assailant under these facts.

■■ In *People v. Reed* (1978), 57 Ill. App. 3d 533, 373 N.E.2d 538, the court addressed the degree of resistance required of a rape victim (57 Ill. App. 3d 533, 538):

> "The degree of force exerted by defendant and the amount of resistance on the part of the complainant are matters that depend upon the facts of the particular case; resistance is not necessary under circumstances where it would be futile or would endanger the life of the complainant, as where defendant is armed with a deadly weapon."

To be distinguished, where rape is charged, is the resistance expected of a child, such as complainant here, and that required of an adult. (*People v. Pointer* (1972), 6 Ill. App. 3d 113, 118, 285 N.E.2d 171.) In the case at bar defendant was armed with a deadly weapon which he had already used against complainant when she first attempted to resist him, causing her head wound. Since this occurred before he forced her into the house, her subsequent failure to scream while defendant still had the hammer available is hardly incredible or even unlikely. The jury's function to determine credibility on the basis, among others, of appearance and demeanor of witnesses is especially important here, since an adult male might easily be powerful enough to force a 15-year-old girl up a flight of stairs and through a closed door while performing the other acts of which complainant testified, depending on the size and strength of the persons involved. The jury here had ample opportunity to observe both parties and accepted complainant's account.

■■ Referring to complainant's pretrial statement that defendant had been requested or had offered to take care of "the child," Nurse

Menchavez's testimony that complainant described herself as six weeks pregnant at the time of the rape and circumstantial evidence linking complainant and defendant prior thereto, defendant raises the possibility that her motive in accusing him "could have been" an act of retribution over his anticipated nonsupport of "the child" or for some other unspecified reason. We find no basis in the record for this conjecture, which in any event was rejected by the jury insofar as it might constitute a defense. Accepting *arguendo* that complainant had a sexual relationship with defendant prior to the rape, his striking of complainant with the hammer and his threats of further violence if she resisted him were sufficient to prove that the intercourse was in this instance committed forcibly and against her will. (See *People v. Secret* (1978), 72 Ill. 2d 371, 378, 381 N.E.2d 285.) In *People v. Wilcox* (1975), 33 Ill. App. 3d 432, 337 N.E.2d 211, *appeal denied* (1976), 62 Ill. 2d 591, a conviction for deviate sexual assault was upheld where the victim had engaged in sexual intercourse with the defendant on a number of prior occasions and had been willing to do so on the night of the assault, but unwilling to engage in a deviate act.

Further aspects of the State's evidence regarded by defendant as inconsistent and improbable we find to be of too minor a character to warrant discussion here.

Defendant argues next that the alibi testimony of Geraldine Boone and Leroy Brown that they saw and spoke to defendant a few minutes after 10 p.m. on the night of the crime raises a substantial doubt of his guilt. He claims that their testimony "* * * was not impeached in the slightest detail," although in complainant's testimony defendant was still holding her in the attic a few moments after 10 p.m. Betty Rogers testified that she spoke to defendant at about 10:15 p.m., after she had heard Eileen Adams calling for complainant at about 10:05 p.m., and that he denied complainant was with him. Her statements thus corroborated complainant's testimony that she heard two voices, first her mother's and then Ms. Rogers', and that defendant answered "[n]o, she isn't here" to a question by Ms. Rogers. Complainant testified that defendant thereafter raped her again before releasing her, thus putting her account of defendant's location in time at variance with that of Brown and Mrs. Boone by a matter of minutes. Since none of those testifying as to defendant's whereabouts in this period based their testimony upon having observed a clock or watch, but estimated the time by changing television programs, inaccuracies within such a span are likely and do not significantly impeach the State's evidence. Nor does such conflicting evidence necessarily raise a reasonable doubt as to defendant's guilt. Triers of fact are not obligated to believe alibi testimony over positive identification of an accused, even when given by a greater number

of witnesses. The jury was in a superior position to observe the demeanor of the witnesses during examination and to consider their obviously strong interest in exonerating defendant. *People v. Jackson* (1973), 54 Ill. 2d 143, 149, 295 N.E.2d 462.

For the above and foregoing reasons the jury's verdict cannot be disturbed and defendant's conviction must be affirmed.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.