THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RAY M. EDMOND, Defendant-Appellant.

First District (5th Division)    No. 78-1817

Opinion filed September 14, 1979.—Rehearing denied October 15, 1979.

Howard T. Savage, of Chicago (Howard O. Edmonds, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendant was found guilty of rape (Ill. Rev. Stat. 1977, ch. 38, par. 11—1), and was sentenced to a term of four years to four years and a day. On appeal he contends that he was not proven guilty beyond a reasonable doubt.

The following pertinent evidence was adduced at trial.

*For the State*

Complainant testified that in January 1978 she worked at the Pepsi Cola Bottling plant in Chicago. While working at the plant, she met the defendant Ray Edmond. After their initial meeting, she had casual conversations with him during work. On two occasions prior to January 26, 1978, he gave complainant a ride home from work. He drove a brown van outfitted with carpeting; a refrigerator; a heater and a seating area across the back.

As a result of a snow storm on January 26, 1978, she and other office personnel were allowed to leave work early at approximately 1:30 p.m. She waited at the plant until 4 p.m., however, to obtain a ride home from defendant. On their way from the plant to defendant's van, she broke the heel of her boot. She asked him to drive her to a shoe repair store at the corner of Madison and Pulaski. It took them two hours to reach the store because of the traffic conditions. After her boot was repaired, defendant went to the liquor store and purchased a bottle of rum and a Coke. She refused his offer to have a drink and she did not have a drink at anytime that evening. From the liquor store, he took a number of side streets to avoid the heavy traffic. Upon encountering a car stuck in the street, defendant tried to go around it, but became stuck in a snow bank. Defendant's attempts to "rock" the van out of the snow were unsuccessful. With the aid of passersby, he tried to shovel the van out of the snow, but was again unsuccessful. By this time, defendant had consumed the bottle of rum. Defendant then told complainant that he was going to walk to a friend's garage to ask for a tow out of the snow. Before leaving the van, he told her that she should sit by the heater in the back of the van to keep warm. Complainant remained in the front passenger seat until she became cold. She then moved next to the heater in the back of the van.

When defendant returned, he told her that his friend was not at the garage. Defendant then said he wanted to get next to her in the back of

the van. She told him to stay in the front of the van. Ignoring her statement, he came into the back of the van and sat next to her. At this point, defendant tried to put his arms around her. She pushed him away and said, "Stay away from me" and "I don't want you to hug me." They began to struggle and defendant struck her several times about the face and stomach. She fought him by screaming, scratching and biting. In fact, she bit him on the hand. Defendant struck her again and began to choke her with his hands. When he stopped choking her, she told him that "he would have to kill me if he wanted to rape me." He said he would. Defendant then forced her skirt up and pulled her panties and pantyhose down. He then had sexual intercourse with complainant. During the act, she tried to push him away and continued to scream. After the performance of the act, she pulled on her clothes and ran out of the van.

She ran across the street to a tavern to get help where she tried to telephone her sister, Betty Atles, but the line was busy. She asked the operator to interrupt the telephone call because this was an emergency. When she spoke to her sister, she told her that she had been raped and beaten. Betty Atles told complainant that she was unable to pick complainant up because her husband had the car. This conversation took place at approximately 10 p.m. After talking to her sister, complainant left the tavern and obtained a cab ride home.

Upon arriving home, complainant talked with her sister Betty who resided with her, and then called the police. The police arrived and took her to Mount Sinai Hospital where she received medical treatment. At the hospital, complainant observed in a mirror, that her face was swollen and bleeding and that two of her teeth were chipped.

On the following Monday, January 30, 1978 she returned to work at the Pepsi Cola Bottling plant. She saw defendant and noticed that his hand was bandaged. In addition, company personnel took photographs of her. She identified People's exhibits 1, 2 and 3 as accurate photographs made of her on January 30, 1978. She also identified the defendant in court as the man who raped her.

On cross-examination she stated that her conversations with defendant prior to January 26 were friendly and pleasant. She admitted that the ride home on January 26 was basically pleasant. During that ride, she was not in fear of defendant. She denied having touched or kissed him in the shoe repair store. She further denied having smoked marijuana on or before January 26, 1978. She admitted that she drank alcohol, but denied having any of the rum purchased by defendant on that day. She admitted that she did not try to leave the van when defendant said he wanted to get next to her. However, she did try to escape when defendant attempted to embrace her. She admitted that when she ran from the van, she did not look for the police. At the tavern, she called her sister first

rather than the police. But upon reaching her home, she promptly notified the police. Under questioning by the court, complainant stated that the public transportation was working on the afternoon of January 26, 1978.

### Betty Atles

She and her family live with the complainant in the same house. At approximately 10 p.m. on January 26, 1978 she was on the telephone when her conversation was interrupted by the operator because of an emergency. After hanging up the phone, she received a call from her sister who was crying and nervous. Her sister said that she had been raped and beaten. She told her that she was unable to come pick her up because she did not have the car. About a half hour later, her sister arrived home and said she had been raped and beaten by defendant. There was a scratch over complainant's right eye; her left cheek was swollen; her lip was cut; there was dried blood on her face, and her clothes were wrinkled and "hanging on the outside." Her sister then telephoned the police. The police arrived and took her sister to the hospital.

On cross-examination, she stated that complainant did drink alcohol, but characterized her drinking as "very little."

### Raymond Mills, Chicago Police Officer

On January 30, 1978, while on duty with his partner, Officer Elliot, he was called to the Pepsi Cola Bottling Company plant in response to a report regarding a rape suspect. At the plant he spoke with the plant manager and complainant. Complainant had swollen scar tissue about her eye. After speaking with complainant, he went to the mechanics area and placed defendant under arrest. At the time of the arrest, one of the defendant's hands was bandaged. He identified defendant as the man he arrested.

### Dr. Dahal

The parties stipulated that, if Dr. Dahal was called as a witness, she would testify that on January 26, 1978, she examined complainant and found her to have "contusions of the face, a swollen right side area of the face, lacerations of the upper lip, a chipped tooth and tenderness of the abdomen."

### Rodney J. Blach, Chemist, Chicago Police Department

The parties stipulated that, if Blach was called as a witness, he would testify that on January 27, 1978, he performed certain serological tests on vaginal smears taken from complainant. The result of these tests was a positive finding of spermatozoa.

### For the Defense

### Ray Edmond, on his own behalf

In January 1978 he was a diesel mechanic at Pepsi Cola Bottling Co. plant in Chicago. During the second week of January, he met

complainant at work. After that first meeting, he talked to her every work day until January 26. On five or six occasions, he met her after work at a tavern across the street from the plant. During their first meeting after work, defendant gave her a tour of the inside of his van. The back of the van contained a refrigerator, cabinets, a sink and a lounger which converted into a bed. On another occasion, she told him that she smoked marijuana and "liked to get high." Based on this information and with the help of a friend, defendant purchased a "nickel bag" of marijuana for complainant. After giving her the marijuana, he was with her on several evenings when she smoked marijuana. He, however, did not smoke marijuana.

At 3:30 p.m. on January 26, 1978, he left work with complainant to give her a ride home. On the way to his van, she broke the heel of her boot. They left the plant in his van and drove to a liquor store. He entered the store and purchased a half pint of rum and a Coke. When he returned to the van with the liquor, she made a drink for herself and one for him. Their next stop was a shoe repair store. By the time they reached the store, she had consumed the half pint of rum. He had only one drink from the half pint. Inside the shoe repair store, she openly kissed and hugged him. After leaving the shoe store he stopped and bought a pint of rum and a Coke at her request. After this purchase, his van became stuck in a snow bank when he tried to avoid a snowbound car on a side street. He could neither drive the van out of the snow, nor with the help of a friend, shovel the van out. While the van was stuck, she remained in the van drinking rum and smoking marijuana. He came back inside the van and told complainant that he was going to a friend's garage to ask for a tow. Before leaving the van, he and complainant kissed. Upon his return to the van, complainant moved to the back of the van to lay on the bed. He joined her on the bed and they began kissing and fondling each other. After a few moments of voluntary sexual intercourse, she went "berserk." She pushed away from him and began screaming, kicking, biting and jumping up off the bed. During this reaction, she struck her head on the roof of the van. He tried to calm her by holding her arms and slapping her three or four times across the face. When she became calm, she told him, "[Y]ou made my nose bleed. You are going to pay for this." A few minutes later, before leaving the van, she threatened him with a charge of rape.

In response to a question by the trial court, defendant said he did not know how complainant's teeth became chipped.

*Kenneth Ray Harvey*

At 6:30 p.m. on January 20, 1978, he met the defendant who was with a young woman. At that time, he had been a friend of defendant for at least six months. The young woman told him that she worked with the defendant. The first name of the young woman was the same as that of

the complainant. He joined them in the defendant's van and smoked a joint of marijuana with the young woman. Following his directions, they drove to a place where defendant and the young woman could purchase marijuana.

*Edward E. Lewis*

He has known defendant since 1969. Approximately one week before January 26, 1978, he talked with the defendant who was seated in his van which was in a parking lot at the corner of Ohio and Hamlin. During his conversation with defendant, he saw complainant on the bed in the back of defendant's van. She was smoking a joint of marijuana. At 8:30 p.m. on January 26, 1978, he saw the defendant's van stuck in the snow on a side street. Along with a friend he aided defendant in trying to free the van. At that time, he again saw complainant. She was lying on the bed in the back of the van and was smoking a joint of marijuana.

On cross-examination, he stated that he had seen defendant drink rum and Coke mixed drinks in the past. He admitted that on May 9, 1978, he spoke with investigators from the State's Attorney's Office. He admitted telling the investigators that he saw defendant and his van at 10 p.m. on January 26, 1978.

Opinion

■■ Defendant contends that he was not proven guilty beyond a reasonable doubt of the offense of rape. He maintains that the act of intercourse was consensual and was not committed by force and against the will of the victim. In reviewing a conviction for rape, we are especially charged with the duty of carefully examining the evidence, and, if the evidence fails to remove all reasonable doubt and to create an abiding conviction of defendant's guilt, we must reverse the judgment. (*People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.2d 211.) But in discharging this duty, we cannot encroach upon the function of the trier of fact to determine the sufficiency, weight and credibility of the evidence. (*People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288.) That determination will be reversed only where the evidence is so unsatisfactory, unreasonable or improbable as to create a reasonable doubt of defendant's guilt. *People v. Reaves* (1962), 24 Ill. 2d 380, 183 N.E.2d 169.

In the trial below, the State had the burden of proving beyond a reasonable doubt that the act of intercourse was committed by force and against the will of complainant. (*People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467.) The degree of force executed by defendant and the amount of resistance by the complainant depends upon the facts of the particular case. (*People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865.) To sustain defendant's conviction for rape, the uncorroborated testimony of complainant is itself sufficient if that testimony is clear and

convincing. (*People v. Mack* (1962), 25 Ill. 2d 416, 185 N.E.2d 154.) However, if the testimony of complainant is not deemed to be clear and convincing, corroboration is necessary to sustain a conviction for rape. (*People v. Kepler* (1966), 76 Ill. App. 2d 135, 221 N.E.2d 801.) With this framework in mind, we turn to the testimony of the complainant.

Complainant testified that she worked in the same plant as defendant and that she had known him for about two weeks. During that time, defendant had given her two uneventful rides home from work. On January 26, 1978, defendant gave complainant a ride home because of the snow storm. After leaving work, defendant purchased a bottle of rum which he alone would drink. While driving down a side street, defendant's van became stuck in a snow bank. Upon failing to free the van from the snow, he came and sat next to complainant in the back of the van ignoring her request that he stay away. He then tried to put his arms around her. She physically resisted his advances. He responded by striking her several times in the face and stomach. She continued to resist him by screaming, fighting and biting. To stop her screaming, he began to choke her. He told her he would kill her if necessary. At that point, he had sexual intercourse with her.

The trial court characterized the testimony of complainant as "clear," "convincing" and "believable." Upon a careful examination of the record, we agree. Complainant gave a detailed account of what happened to her on January 26, 1978. Moreover, she described the degree and tenacity of her resistance to defendant and the brutal force exerted by defendant against her.

■■ Furthermore, the testimony of complainant has been corroborated on several points. First, complainant immediately told her sister that she had been raped and, after arriving home, notified the police. A victim's prompt complaint of rape is recognized as corroboration of her testimony. (*People v. Reed* (1978), 57 Ill. App. 3d 533, 373 N.E.2d 538; *People v. Jones* (1976), 40 Ill. App. 3d 850, 353 N.E.2d 375.) In addition, the presence of spermatozoa in the vaginal smear taken from complainant can be considered as corroboration of her testimony. *People v. Solheim* (1977), 54 Ill. App. 3d 379, 369 N.E.2d 308; *People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651.

Further, the injuries suffered by complainant were corroborated by the testimony of her sister, Officer Mills, Dr. Dahal and the photographs which were admitted into evidence. The injury to defendant's hand resulting from a bite by complainant was corroborated by the testimony of Officer Mills. Corroboration is also found in the testimony of complainant's sister that an operator interrupted her conversation on January 26 with an emergency call from complainant; that complainant was

crying and nervous during the call, and that complainant's clothes were wrinkled.

■■ We believe that the clear and convincing testimony of complainant and the numerous points of independent corroboration of her testimony are clearly sufficient to establish defendant's guilt beyond all reasonable doubt.

Defendant argues, however, that complainant's consent to the act of intercourse is implicit in the undisputed facts of the case. Defendant relies on the following facts: complainant waited approximately two hours for a ride home from defendant; public transportation was working and available to complainant at that time; she knew the defendant was a married man; the ride home lasted several hours because of the snow; during the ride, she neither insisted on going straight home nor called her relatives to explain the delay; and she knew defendant's van contained a seating area in the back and that the van was referred to as a "leisure van." Based on these facts, defendant argues that complainant consented to a day of adventure which included sexual intercourse with defendant. We disagree. Although complainant may have consented to a ride home and to the defendant's company during the ride, neither the facts nor the law warrant an inference that she also consented to sexual intercourse.

Next, defendant argues that the evidence produced by the defense witnesses creates a reasonable doubt as to whether the act of intercourse was committed by force and against the will of complainant. According to the defense theory, complainant was drinking rum and smoking marijuana throughout the course of that evening. She initiated all sexual contact with defendant and consented to the act of intercourse. Defendant maintains that the injuries sustained by complainant were the results of her bizarre reaction to the act of intercourse and defendant's efforts to calm her. In essence, the evidence produced by the defense is in direct conflict with the State's evidence on the issue of consent.

A similar conflict on the issue of consent was raised in *People v. Barksdale* (1976), 44 Ill. App. 3d 770, 358 N.E.2d 1150. In *Barksdale*, the court stated:

> "The issue of whether the acts of intercourse were forcible or consensual is ultimately one of credibility. In this regard, it is neither the duty nor the privilege of a reviewing court to substitute its judgment as to the weight of disputed evidence or the credibility of witnesses for that of the trier of fact who heard the evidence presented and observed the demeanor of the witnesses."

(44 Ill. App. 3d 770, 775, 385 N.E.2d 1150, 1154.)

As we stated above, we will not reverse the judgment of the trier of fact as to credibility unless the evidence is so unsatisfactory, unreasonable or improbable as to create a reasonable doubt of defendant's guilt. (*People v.*

*Reaves* (1962), 24 Ill. 2d 380, 183 N.E. 2d 169.) In light of complainant's testimony, as reviewed above, and the independent corroboration of her testimony, we see no reason to disturb the trial court's decision to believe the State's evidence. We would also note that defendant's testimony is weakened by his inadequate explanation of the severity of the injuries sustained by complainant.

Defendant's third argument centers around the physical act itself. Defendant points out that complainant testified that her panties and pantyhose were pulled down to her knees during the act. No evidence, as noted by the defendant, was presented that either her panties or pantyhose were torn or stretched as a result of the act. According to defendant, two conclusions can be drawn from these facts. First, an act of intercourse was physically impossible because of the positioning of the garments and therefore no act of rape occurred. Second, an act of intercourse did take place, but complainant's testimony regarding the act was significantly inaccurate. Therefore, a reasonable doubt as to defendant's guilt exists. With regard to the first conclusion, both complainant and defendant testified that an act of intercourse occurred. Additionally, at oral argument, defense counsel admitted that the only issue was consent. Consequently, we find no question involving the existence of the act of sexual intercourse. Under the second conclusion, defendant's attack is at the credibility of complainant. The credibility of complainant is a determination to be made by the trier of fact who heard the evidence and observed her demeanor and appearance. (*People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288.) We do not believe the evidence to be so unreasonable, unsatisfactory or improbable as to create a reasonable doubt of defendant's guilt and, therefore, will not alter the trial court's determination to believe complainant.

■■ Finally, defendant argues that his lenient sentence of four years to four years and a day belies the trial court's reasonable doubts as to his guilt. In short, defendant's argument is pure speculation as to the trial court's reasoning in granting this sentence. We cannot believe that a trial court, while having reasonable doubts as to defendant's guilt, would convict defendant of a crime and then to assuage its conscience grant a lenient sentence. Rather, it is our opinion that the trial court acted properly within its discretion in imposing this sentence based on the particular facts of this case. Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.