THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
KEVIN GREEN, Defendant-Appellant.

Fifth District   No. 5—84—0002

Opinion filed January 10, 1986.

HARRISON, J., dissenting.

James J. Gomric, P.C., of Belleville (James J. Gomric and Kevin Boyne, of counsel), for appellant.

John Baricevic, State's Attorney, of Belleville (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Service Commission, and James P. Gallagher, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

A St. Clair County jury found defendant Kevin Green guilty of rape and deviate sexual assault. The court sentenced defendant to concurrent terms of six years of imprisonment. Defendant appeals contending that he was not proved guilty beyond a reasonable doubt.

We refer to the victims as Shirley and Helen. Shirley testified on direct examination as follows: She first met defendant through her

ex-boyfriend, Paul Graham, about two years prior to June 3, 1983, the date in question, when Graham was "staying" with her at another address. Defendant had been to her present residence once before. On that occasion she saw defendant at "Jupiter's"; she told him about "problems" she was having with her neighbors; he trailed her to her house; he was there half an hour, during which he met Shirley's landlord and "told my neighbor that he would be by there to check on me, which I hadn't seen him in two weeks before that night." On June 3, 1983, the night in question, at about 4 a.m., she was in bed; her friend Helen was also there. Someone knocked at the entrance door. At first he had his head down and she did not recognize who it was. It was defendant. She told him "don't you know all people are in bed at this time in the morning," but she let him in: "Because we were going as play brothers and sisters, and you know he would come by, if I have problems or something. Trusting him." In her bedroom ("I don't really go in my living room for anything"), she sat on the bed, he in a chair, talking about his meeting with Graham earlier that night, until defendant began to nod off. She showed him to the living room couch, then went for a bedspread. When she returned, defendant was in the living room doorway, gun in hand; he knocked the spread from her hand. She "leaped on him" and wrestled for the gun. "[W]e wound from the living room into the bedroom where Helen was at." Helen got out of bed; "that's when he started slinging me up against the wall," bruising her right leg. He cocked the gun, ordered them into the living room, and told them to undress. Then he ordered them into Shirley's bedroom and forced Shirley to perform oral sex on him and forced Helen to perform oral sex on Shirley. He told Helen to go back to bed. Shirley put her pajamas on. He and Shirley talked in Shirley's bedroom while Shirley wiped blood from her leg; "he said, 'Don't you remember when me, you, and Paul went over in St. Louis to Sally's house?' I say, 'Yes.' He say, 'Remember when Paul had accused me of trying to talk to you?' I say, 'Yes.' Like that. He say, 'have I ever touched you?' I said, 'No.' He said, 'Have I ever tried to touch you?' I said, 'No.' He said, 'I'm tired of people accusing me of something I know I haven't did.' " The gun was in his hand as they spoke. Minutes later, he told her to strip, and he performed oral sex on her and raped her at gunpoint. She saw Helen trying to get downstairs, so "I said would you ask Helen to come in here with me," because she did not want to be alone with defendant. Helen came into the bedroom. Defendant, still lying on Shirley, told Helen to sit on the bed. He held the gun to Helen's head and told Shirley, "you better act like you like it." Then he ordered Helen to undress and perform oral

sex on him. He raped Shirley again, then made Helen perform oral sex, first on him, then on Shirley. He offered to let Shirley shoot him, though it does not appear from her description whether he relinquished control over the weapon. He told them to lie on their stomachs; he asked if they had any vaseline; Shirley said no. He got on top of Helen and "stuck the gun somewhere near her behind." Helen started to cry. Defendant made Shirley perform oral sex on him again. Soon thereafter he fell asleep, but first he threatened to kill her if she went to the police. Shirley and Helen ran downstairs. Helen ran back up and retrieved their clothes. A man across the street took them to a telephone, where they called the police. Shirley denied ever having sex with defendant before the night in question.

Shirley testified on cross-examination: She had been in defendant's company four times altogether, including the once at her present residence, though she had seen him other times. He had visited her other residences, but always with Paul Graham, with whom she was staying then. Asked to explain "play brothers and sisters," she stated: "We'd started that on 11th and Bond [her former residence], since him and Paul were real close, and he's the one that said we were play brothers and sisters. Let's go as play brothers and sisters." She let him in: "Because he said he was coming by to check on me, and I thought I had knew him." Asked what he was checking on, she replied: "Checking to see if I was all right, if I was having any more troubles out of my neighbors." She knew he was a security guard. She replied affirmatively when asked whether defendant had intercourse with Helen. She denied telling an officer that she thought defendant was a man named Gary.

Helen testified on direct examination: On the date in question, she heard Shirley answer the door and ask "what are you doing coming over at this time and hour." Later, she heard "arguing or something." Suddenly they were in her room; defendant had a gun. Helen had never seen him before. Defendant ordered them to disrobe. Then he told Helen to put her clothes back on and go back to bed. He and Shirley went into Shirley's bedroom, the door nearly closed. Helen was sneaking down the stairs when Shirley hollered, "Helen, don't try nothing." Helen climbed the stairs. On Shirley's request, defendant told Helen to come in. She did. He was lying on Shirley. After a few minutes, he told Helen to take her clothes off. She told him she was menstruating. He said he did not care. He ordered Helen to perform oral sex on Shirley, then on him, at gunpoint. He made both of them lie on their stomachs, "but he didn't do nothing you know, but he did kind of put that gun up in my behind a little bit." He made

Helen perform oral sex on him again, then fell asleep. Helen and Shirley ran downstairs, but Helen returned to retrieve Shirley's clothes. A man across the street took them to a telephone.

Asked on cross-examination whether she had left anything out on direct, Helen testified that "he just made me get on top of him, you know, he put his penis in me, but it wasn't for long, didn't last no time." She admitted that she must not have told Detective Boone, who took her statement," because it ain't in my statement, but he did do that, you know." She explained: "By everything has happened, you know, it kind of slipped my mind, you know." She was almost at the foot of the stairs when Shirley called her back; "that startled me, because I didn't know whether that man was going to come to the stairs and start shooting or what." She estimated that the entire sequence of events lasted 3½ hours.

Alma Ray, an emergency room nurse at St. Mary's hospital, testified for the State that she was on duty when Shirley and Helen arrived accompanied by a police officer. According to Ray, Shirley had abrasions on her right knee and right lower leg; she had no other injuries; Shirley was calm when she arrived, but when Ray took her to a private room, Shirley became very upset, crying at intervals as she related the story. Ray testified that in her experience it was quite common to find no physical injuries in a rape case.

On cross-examination, Ray testified that Vitullo evidence kits were used on Shirley and Helen; however, Ray had treated only Shirley.

Helen Sandkuhl, also a registered nurse, testified for the State that she treated Helen in the emergency room: Helen stated that she had been raped and forced to commit oral sex; she had no injuries. Sandkuhl testified that in most rape cases she had treated there was no external trauma. According to Sandkuhl, the Vitullo evidence kit tests would indicate the presence of semen in the vagina after a rape, or in the mouth after oral sex, unless the man did not ejaculate. Sandkuhl testified that tests for presence of semen in the mouth could be defeated if the person drank something or swallowed many times since the act.

James Jarrett, an East St. Louis police officer, testified for the State that at 7:55 on the morning in question, he was dispatched to Shirley's address; he and Officer Rodell Andrews accompanied Shirley and Helen upstairs; defendant was lying on a bed; a loaded gun was underneath him; he was clad in only a shirt. According to Jarrett, the women were "terribly upset"; he noticed an injury to Shirley's right knee; Shirley told him that when she first let defendant in she

thought he was an old friend named Gary.

On cross-examination by defense counsel, Jarrett testified that Shirley told him defendant did what he did because he had had an argument with Graham, and that defendant was getting back at Graham.

Defendant testified in his own behalf as follows: He worked as a security guard; he had never "really seen" Helen prior to the instant trial; he had known Shirley five years; they "had a few relationships, like girlfriend, boyfriend"; he had intercourse with Shirley "quite a few times." About a month before the date in question, defendant told Shirley that he and his wife had separated. "I was tired of being by myself, since we had been messing around *** we was going to be together." Two days before the date in question, he and Shirley spoke to Shirley's landlord, Marvin Faulkner, about defendant renting an apartment downstairs from Shirley's "so we could be close." On the date in question, defendant and Shirley talked about defendant's relationship with his wife: Shirley had seen defendant with his wife "and I explained to her we were talking about getting back together because I really had not made any promises to her. She was the mother of my children." Shirley did not like that: "She stated that if I didn't stay there she would—[Question intervenes.] She would never send me back with my wife." He did not have intercourse with Shirley that night. He arrived at her home at 4 a.m.; his car had had a flat tire in the rain; she let him in; he went upstairs and slept. Shirley knew he carried a weapon as part of his job; he placed it under his pillow.

On cross-examination, defendant testified that he had been out drinking that night with Paul Graham. Defendant testified on redirect that Faulkner, the landlord, had probably seen him at Shirley's apartment several times "because he was outside working."

Michael Brown, a forensic scientist employed by the Illinois Department of Law Enforcement, testified for defendant as follows: Tests of oral and rectal swabs from both victims for the presence of seminal material had negative results. There was seminal material present in Shirley's vaginal swab, but only a small amount. "If there is ejaculation given that there isn't circumstance which would quickly clean the seminal material out, you would expect to find more than just a trace within several hours." In his opinion this finding would be consistent with (1) the woman having had intercourse 24 hours before the test; (2) having sex with someone who did not ejaculate; or (3) cleaning the vagina after intercourse. Seminal material was not often found on an oral swab.

In rebuttal for the State, Mr. Faulkner, Shirley's landlord, testi-

fied that he met defendant just once, for a minute; he would not know him now; they never had any business dealings and defendant never looked at an apartment as a prospective renter while he (Faulkner) was there. Shirley "introduced this fellow to me as being Kevin and she said these words, 'this is my play brother' \*\*\*." Faulkner did not recall the date when this occurred.

Shirley and Helen testified on rebuttal for the State. Each testified that to her knowledge defendant did not ejaculate into her on the date in question.

■ In reviewing a conviction for rape, we must carefully examine the evidence, and if the evidence fails to remove all reasonable doubt of defendant's guilt, we must reverse the judgment. If the testimony of the complainant is not clear and convincing, corroboration is necessary to sustain the conviction. (*People v. Edmond* (1979), 76 Ill. App. 3d 540, 546, 395 N.E.2d 106, 111.) In the case at bar, prior to sentencing defendant, the able and experienced trial judge stated: "I don't feel good [about] this verdict, and, I want the Appellate Court to examine it carefully, my remarks where I say I don't feel good about it. And, I find it hard to believe the testimony of the complaining witness [*sic*]." The appellate court hesitates to interfere with a jury verdict (*People v. Edmond* (1979), 76 Ill. App. 3d 540, 395 N.E.2d 106), and this is in part because the jury watches the witnesses and hears them testify, and therefore can assess witness credibility and the weight due testimony better than we can from a paper record. In the case at bar, the trial judge, who also saw and heard the witnesses, made the finding which should have preceded his overruling the verdict of the jury. He neglected to give that finding its proper effect.

■ We have carefully reviewed the record. We find sufficient evidence to explain the verdict of the jury, but not enough convincing evidence to justify it. We do not find the complaining witnesses' testimony clear and convincing. While Shirley and Helen disagree on some minor points, most notable is their failure to agree on whether there were two sex sessions or just one. We would expect them to agree on whether, after being forced to disrobe, Helen was told to go back to bed or was forced to perform oral sex on Shirley. Also improbable is Helen's testimony that she returned to Shirley's room when she was downstairs and almost free.

In addition, corroborative evidence was scant. There was no corroborative medical evidence, unless one considers Shirley's leg injury, which could have been innocently caused, and the recovery of some seminal material from her vagina, though not enough to prove inter-

course within the time frame in question. While evidence of the complainants' prompt complaint was technically corroborative, defendant's testimony regarding Shirley's motive to falsify renders that evidence of questionable value.

Various other potentially corroborative facts lose much of their significance because those facts are consistent with defendant's account of what happened. Defendant explained that his possession of the loaded gun was due to his job. That defendant was found armed, partially undressed and asleep is consistent with his testimony that he and Shirley had a relationship, rather than her testimony which suggests a motive on his part to escape or hide the weapon. His testimony that he and Shirley were boyfriend and girlfriend, if believed, explains why she would invite him in at 4 a.m. and offer him a place to sleep. While Shirley was described as upset, this is also consistent with a failed relationship.

We are also impressed by the evidence not elicited by the State. For example, there was no police testimony that Shirley's residence appeared to be the scene of a struggle. Paul Graham did not testify, though Shirley's references to him suggest that he could have corroborated some of her testimony.

In light of the foregoing, we must conclude that sufficient doubt exists as to defendant's guilt that his convictions must be reversed. In so concluding, we recognize that this should rarely be done where a jury verdict is involved. We do not claim to know what really happened on the night in question. However, we do perceive substantial doubt of what happened, and in a criminal case it is that doubt which requires reversal.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is reversed.

Reversed.

KARNS, J., concurring.

JUSTICE HARRISON, dissenting:
I respectfully dissent.

The supreme court has recently stated that "[a] criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *** When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. As the United States Supreme Court observed in *Jackson v. Virginia*

(1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276-77.

In the present case, the majority cites what it views as inconsistencies and improbabilities in the evidence. The majority notes, for example, that the two victims did not agree on the sequence of events. However, their testimony was consistent with regard to the details of the sexual acts. Other inconsistencies or improbabilities in the evidence were either minor or could be explained.

I cannot agree there was anything here to make the evidence so improbable or unsatisfactory as to create a reasonable doubt. Nor can I agree that no rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. The jury viewed the demeanor of the witnesses and judged their credibility.

I would affirm.