THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFFREY YEARGAN *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—88—2820, 1—88—2821 cons.

Opinion filed April 20, 1992.

Randolph N. Stone, Public Defender, of Chicago (Lisa Ottenfeld and Vicki Rogers, Assistant Public Defenders, of counsel), for appellants.

Cecil Partee, State's Attorney, of Chicago (Bonnie Meyer Sloan, Special Assistant State's Attorney, and Renee Goldfarb and David Rosenfeld, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Following a bench trial, defendant Jeffrey Yeargan was found guilty of five counts of criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1)) and one count of unlawful restraint (Ill. Rev. Stat. 1987, ch. 38, par. 10—3(a)) and sentenced on two counts of criminal sexual assault to concurrent terms of seven years' incarceration. Pursuant to the same proceeding, codefendant Gregory Thompson was found guilty of four counts of criminal sexual assault and one count of unlawful restraint and sentenced to five years' incarceration.

Defendants appeal contending that they were not proven guilty beyond a reasonable doubt. Yeargan raises the additional issue of whether he was impermissibly convicted under the criminal sexual assault statute for an act the statute does not proscribe. We reverse.

At trial, complainant, age 27, testified that she was born with mostly female organs, but also had a male sex organ, a scrotum. In April 1987, she did not have a vaginal opening but had an urethra coming from her bladder, which enabled her to urinate. Complainant has no children and is divorced.

On April 18, 1987, at approximately midnight or shortly thereafter, she left her sister's home on Kildare, north of Fullerton Avenue in Chicago, with her dog, a four- to five-year-old "collie-shepherd," to go to her home. On the way, she stopped at a nearby 7-Eleven store to purchase dog food and groceries.

While walking home on Fullerton from the 7-Eleven Store, complainant encountered two men in a 1972, light-blue, two-door car parked at the curb. The person seated in the passenger seat called her over to the car. She identified that person as defendant Yeargan; she also identified defendant Thompson as "looking like" the other man seated in the driver's seat. She testified that both men asked her for a "head job." When she declined, they asked again. She again refused.

After this encounter, she continued towards home. She walked about one-half block when she noticed that the two men were following her. She started walking faster and headed towards a corner gas station. She cut through the gas station and entered a "T" formed by the alley that runs behind her house and the gas station. There, she was grabbed by the defendants on her arms. She asked defendants to let her go but they would not. Defendants forced her to walk half-way down the alley and into an open garage containing a parked car on one side.

Inside the garage, Yeargan asked her to remove her jacket and she complied. After she refused to remove her shirt and bra, Yeargan forced it off, stating they would hurt her if she did not do what they told her. Both defendants removed her pants, and Yeargan then told her to get on her hands and knees. She complied.

Yeargan then got in front of her, pulled her head up by her hair and put his penis in her mouth. Meanwhile, Thompson was behind her attempting to put his penis in her "bladder" (her urethra), the opening she has where a vagina would normally be. He then put his penis in her anus, which hurt her. Yeargan ejaculated in her mouth and she spit out the seminal fluid.

After Yeargan ejaculated, defendants switched places. Thompson pulled her hair up and put his penis in her mouth while Yeargan put his penis in her "bladder" and rectum. Thompson ejaculated and she spit it out. Yeargan then returned to her front and placed his penis back in her mouth. At this time, Thompson put on his pants and left the garage. Yeargan ejaculated in her mouth and she again spit it out. Yeargan then unsuccessfully attempted to place his penis in her rectum. Yeargan next proceeded to put his penis in her "bladder," ejaculating "some inside and some outside."

After Yeargan removed his penis from her "bladder" he stated, "Did that feel good, bitch?" He then dressed, exited the garage, and walked back towards the bar. She testified that she hurriedly dressed and secretly followed Yeargan from a short distance. As defendants were about to drive away, she wrote on her hand, from a one-half block distance, the license number of the car from which defendants had exited earlier. She also noticed that her blue lighter was missing. She identified in court a photograph depicting her hand, various photographs depicting the scene of the alleged assault, and a lighter which she claimed was the one taken from her.

After defendants drove away, she returned to get her dog and then went to the nearby gas station where she called the police. When the police arrived, she told them what happened, showed them her hand, and gave them a description of defendants' car. While not remembering the exact order of occurrence, she testified that she showed the officers the garage where the assault occurred and also took her dog and groceries to her home. At home, she told her aunt that she was going to the hospital. On the way to the hospital, she saw the defendants and identified them for the officers.

Counsel for Thompson and Yeargan both cross-examined complainant. During Thompson's cross-examination, complainant testified that there was a tavern where the defendants' car was parked. Although she was scared when they started to follow her, she did not go into it or the nearby gas station or telephone the police. Rather, she went home the way she always went, by way of the alley. At the "T," defendants grabbed her by her arms, which were bent at the elbows against her body, and walked her one-half block to the open garage.

Complainant admitted that when she was grabbed, she did not scream, shout, fight back, drop her groceries or let go of the dog's leash. However, she did tell her dog without success to attack defendants. Complainant explained that her dog was a friendly dog which had never bitten anybody and which liked to be "petted a lot." Before

entering the garage, complainant complied with defendants' request that she tie up the dog outside.

Complainant testified she was 5 feet 8 inches tall and weighed 180 pounds. Neither defendant had a weapon, nor did any defendant strike her, push her to the ground or physically harm her. Complainant testified she suffered no bruises or lacerations although she was threatened with physical abuse.

During cross-examination, Thompson questioned complainant about the number of ejaculations. Complainant testified:

"Q. Tracey, isn't it true that you testified that Mr. Thompson ejaculated in your mouth twice?

A. Yes, sir.

Q. Isn't true that your testified that Mr. Yeargan ejaculated in your mouth four times?

A. Three and I didn't say—

Q. Three times? Did anyone ever—Isn't it true that you testified that they ejaculated in your anus?

A. Yes.

Q. And isn't true that you also testified that one of the defendant's ejaculated in your urethra?

A. Yes. And also had a rubber on.

Q. Now who had the rubber on?

A. I think it was he.

Q. Which one is he?

THE COURT: Who are you pointing to?

A. (Pointing).

THE COURT: Record would indicate the witness has pointed to Mr. Thompson.

BY MR. TROMBETTA [Defense attorney]:

Q. What did he do with that rubber?

A. After he put in on I felt the rubber. It feels a like a rubber bag. He put it inside. I don't know which part. The rectum or the bladder. And it hurt.

Q. He did that with the rubber on?

A. Yes, sir.

Q. Did he ejaculate?

A. I couldn't tell because with the rubber.

Q. But you did state that he did ejaculate with the rubber on before?

A. I'm sorry, what?

MR. BABRARO [Assistant State's Attorney]: Objection.

THE COURT: You may answer that question. Did you say that he ejaculated with the rubber on before?

A. That was the only time he had that rubber.

Q. Wasn't true that you first testified that Mr. Yeargan had the rubber on?

A. I don't know who had the rubber on. All I remember is it was him. I got a slow mind and I can't remember that good anyway.

THE COURT: Indicating Mr. Thompson."

Regarding her disability, complainant explained that she suffered from a mental disability which caused her to have memory problems and a slow mind. She explained that she was in special education until she was 21 years old and that she was on "SSI" for her disability or handicap. Complainant did not explain the source of her handicap or disability.

On cross-examination by Yeargan, complainant testified that she was fearful for her life after she noticed she was being followed. She admitted she could have stayed on Fullerton rather than going home by way of the alley. She testified she did not place a telephone call to the police when she was being followed because she did not want to put down her groceries and have them stolen. Complainant did explain, however, that her street has no street lights and the alley route to her home is shorter and is the normal route she takes home from her sister's.

Yeargan also examined complainant regarding the details of the assault. She again testified that first Yeargan and then Thompson ejaculated in her mouth. Complainant then testified that, "as far as [she] knew," Yeargan ejaculated in her rectum or bladder. Complainant then testified:

"Q. Then again you testified they switched for the third time, is that correct?

A. The third time he left. (Pointing.)

THE COURT: Indicating Mr. Thompson.

MR. VENIT [Defense attorney]:

Q. And Mr.—

A. The other guy stayed.

Q. And Mr. Yeargan stuck his penis in your mouth for the third time?

A. Yes, sir.

Q. And for the third time he ejaculated in your mouth for the third time, is that correct.

A. Which one?

Q. Mr. Yeargan.

A. Yes.

* * *

Q. Now your are testifying that Mr. Yeargan came three times in your mouth and twice in your bladder?

A. You ain't getting what I'm saying. He came three times in my mouth. He came twice in my mouth.

THE COURT: Indicating Mr. Thompson.

A. And he came also in my rectum and the bladder.

MR. VENIT [Defense attorney]:

Q. You're indicating Mr. Thompson, is that correct?

A. Yes. I can't remember everything. Then he also came in my rectum and the bladder.

Q. This was—

THE COURT: Indicating Mr. Yeargan.

MR. VENIT [Defense attorney]:

Q. And this was a period of what took how long?

A. I guess about 15 or twenty minutes. That's what I guessed it.

Q. So within 15 or twenty minutes Mr. Yeargan came four times or ejaculated in your mouth or your rectum four times?

A. Three times in my mouth, I told you, and about twice to him.

Q. Now twice—Only twice to Mr. Thompson now?

A. You getting me confused.

THE COURT: The witness is confused. Please ask another question."

Officer David Jezioro testified that on April 18, 1987, at about 1:20 a.m., he received a radio assignment to see a "rape victim at Kostner and Fullerton." When they arrived, they met with complainant, who was upset and confused and who appeared disheveled and dirty. The victim showed Jezioro her hand on which was written letters and numbers that she said represented the license plate number to a light-blue Oldsmobile. The victim described the two men as white with the taller one having blond hair (Thompson) and a beard and the shorter one having darker hair, a moustache and wearing a red shirt (Yeargan). Both men had on blue jeans. Jezioro testified that the gas station where he met complainant was closed.

Officer Jezioro immediately broadcast a flash message over the radio regarding the suspects. The officers then took complainant to her home to drop off her groceries and dog and then proceeded to the garage where the assault took place. Upon arriving at the garage, Je-

zioro immediately noticed what appeared to be a used condom and a condom package. There were also two small puddles of what appeared to be semen. Jezioro called for an evidence technician and a one-man patrol to guard the scene.

The officers then responded to a call over the radio. As the officers and complainant were driving there, and as they approached an intersection, complainant shouted from the rear seat, "that's them," and pointed to the defendants. The officers then took complainant to the hospital.

On cross-examination, Officer Jezioro testified that at the scene of the crime complainant told him that Thompson had assaulted her first. She told Jezioro that Thompson stuck his penis in her mouth and grabbed her hair while Yeargan was behind her. The defendants then switched places, with Yeargan in front and Thompson behind. Thompson then left the garage. Complainant also told Jezioro that after the assault, she hurriedly dressed and rushed back to where the car was parked where she obtained the car's license plate number.

Jezioro testified that he did not notice any cuts, bruises or welts about the complainant's face or body although she complained of pain and her clothing was disheveled. Jezioro admitted that he did not know whether complainant always dressed the way she first appeared to him.

Detective Peter Arpaia testified that on April 18, 1987, at about 1:15 or 1:20 a.m., he and his partner received a call to proceed to 4401 West Fullerton, where he observed a marked vehicle with two officers and a woman seated in the rear. He had a conversation with the officers, and he and his partner began to tour the area for the offenders and their vehicle.

Arpaia located an unoccupied vehicle matching complainant's description near 5000 West Armitage in Chicago. The officers waited for about 10 to 15 minutes until the two men, later identified as defendants, walked to the vehicle. Defendants talked for a couple of minutes and then Thompson got in the car and drove away. Arpaia stopped Thompson and arrested him and then arrested Yeargan. When the other officers arrived with complainant, she positively identified defendants and said that one of them had taken her blue Bic lighter. The lighter was found in Thompson's possession.

On cross-examination, Arpaia testified that complainant told her that Thompson was the first one to assault her orally. She said that at this time Yeargan was behind her fondling her and she may have said that he anally attacked her. He saw two puddles of fluid on the garage floor.

The parties stipulated that Dr. Beringer, an expert in the field of emergency medicine at John F. Kennedy Hospital, would testify that he examined complainant in the early morning hours of April 18, 1987, and concluded that complainant was an hermaphrodite. She had female chromosomes, no vaginal opening, and had been born with a scrotum. Through a series of childhood operations complainant had a labia formed. Beringer conducted an examination of her urethra and there were no tears, lacerations, bruises or abrasions. He conducted a rectal examination and, while tender, there were no cuts, abrasions or bruises.

The parties stipulated that Christine Anderson, an expert in the field of serology, would testify that the condom recovered from the scene did not contain semen. Tests taken from the victim's urethra, anus and mouth did not reveal the presence of semen.

The parties also stipulated that Chicago police officer Patterson would testify that a palm print taken from the car in the garage matched that of Yeargan. Patterson would further state that a second palm print from the garage matched the palm of Thompson.

Defendant Yeargan testified that on Friday, April 17, 1987, he took the bus to a Chicago bar, the Fill Up Station, where he arrived at 9:30 p.m. Many of his friends were at the bar, including Thompson, whom he had known since grammar school. About 10:15 p.m., he and Thompson went outside to smoke marijuana. As he was rolling the cigarette, a woman with a dog and groceries approached Thompson's car. Yeargan rolled down the window, and the woman said that for $5 each she would give them a "blow job." In response to where this would occur, the woman told defendants that they would go to her house located a short distance away.

Yeargan and Thompson exited the vehicle, and Yeargan noticed that the woman had a dog and a bag of groceries with her. They walked with her towards the west on Fullerton's south side, crossed Kostner, and then entered a "T" in an alley by cutting through a gas station. As they were walking toward Belden smoking the cigarette, the woman said that they could not go to her house because someone was home. Complainant suggested a garage on the alley as an alternative.

Defendants followed the woman to the garage. There, the woman pulled Thompson into the garage first. By this time, only 10 minutes had elapsed from the initial conversation. Five minutes later, Thompson came out and the woman motioned for Yeargan to enter. Yeargan was concerned about the dog and the woman quieted the dog down, calling him "Bear." The woman, while kneeling, then performed fella-

tio on Yeargan as he leaned up against the car for comfort. He could not remember if she spit out or swallowed the semen. This was the only way they had sex and the woman remained clothed the entire time.

After having oral sex with Yeargan, the woman asked for her money. Yeargan told her that Thompson must have gone back to the bar, and because he did not want to pay for both of them, Yeargan and the woman walked back together to get money from Thompson. Yeargan walked inside the bar and walked up to Thompson and told him that the woman wanted her money. Thompson replied that if she came into the bar, he would give her the money, but he was not going to walk outside to give it to her. Yeargan decided that he too would not pay unless she came into the bar. Yeargan noticed her standing next to the car for about 30 minutes to an hour, but she never entered the bar.

Yeargan left the bar at about 12 a.m. with a friend and went to the Boardwalk, a bar on Armitage. Yeargan left the Boardwalk at 2 or 2:10 a.m. and saw Thompson out in front talking to some people. Yeargan asked Thompson for a ride, but Thompson refused. Yeargan then waited by Thompson's car and again asked him for a ride. Thompson again refused, entered his car and then drove away. Yeargan saw the detectives follow Thompson; five minutes later the police drove up.

After he was arrested, the officers asked Yeargan whether he had sexual relations with complainant. He denied that he did because he was not thinking about the encounter in the garage. When he was being arrested, it dawned on him that the woman must have called the police. Yeargan said that at the police station he told the police what happened, but denied telling them that he had vaginal or anal intercourse with complainant.

A stipulation was entered that if Miss Sharon Medrys were called to testify, she would state that she was a registered nurse who, on April 18, 1987, at approximately 2:30 a.m., had a conversation with complainant. Complainant told her that she was assaulted at approximately 11:30 p.m. to 1 a.m. by her blond assailant (Thompson), who first penetrated her rectum using a condom; that she believed both men ejaculated; and that both men forced her to perform oral sex and they both ejaculated. Complainant denied any complaints of pain and stated that her assailants had not beaten her but had pulled her hair and threatened her. The victim also told Miss Medrys that she was in no distress.

In rebuttal, Detective Edmond Mook testified that on April 18, 1987, at about 5:20 a.m., he spoke with Yeargan. Mook informed Yeargan that he had been arrested for sexual assault. Yeargan denied any involvement in the act at first, but later he admitted that he had engaged in oral copulation with complainant. Later, Yeargan admitted to anal intercourse and to what he then thought was vaginal intercourse.

At the close of the evidence, the court, sitting as trier of fact, found defendants guilty of rape. The dispositive issue on appeal is whether defendants were proven guilty beyond a reasonable doubt.

Our review of defendants' sufficiency argument is governed by the recent Illinois Supreme Court case of *People v. Schott* (1991), 145 Ill. 2d 188. In *Schott*, the court abandoned the clear and convincing standard traditionally applicable to sex offense cases and replaced it with the beyond-a-reasonable-doubt standard. The court stated:

> "We find that where the evidence is claimed to be insufficient on review, regardless of the nature of the evidence, the reasonable doubt test set forth in [*People v. Collins* (1985), 106 Ill. 2d 237,] should be applied. According to *Collins*, 106 Ill. 2d at 261, criminal convictions are not to be overturned on review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. The test to be employed on review ' "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' (Emphasis in original.) *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789." *Schott*, 145 Ill. 2d at 203.

As *Schott* makes clear, we must affirm this case if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Here, after careful review of the evidence, we are left with the firm belief that the night's events either transpired as defendants allege or, alternatively, if they occurred as charged, the State has failed to prove its case beyond a reasonable doubt.

Doubt as to defendants' guilt has many sources in this case. First, aside from one piece of physical evidence, little or no physical evidence exists to support complainant's testimony. In this regard, much of the physical evidence is as consistent with Yeargan's testimony as it is with complainant's. Second, a careful review of the evidence

yields numerous areas of doubt which, when taken together and not alone, shed significant doubt on complainant's testimony. Finally, a close analysis of complainant's testimony regarding the number of ejaculations which allegedly occurred during the assault yields another area of significant doubt.

■ We first address the physical evidence in this case, both as to how the presence of some physical evidence corroborates complainant's testimony, and as to how the absence of other evidence which should reasonably be present simultaneously undermines complainant's testimony.

The most significant piece of physical evidence in this case to corroborate complainant's testimony is the presence at the scene of an unraveled condom and its packaging. Complainant testified that Thompson wore a condom during one of the assaults. On the other hand, Yeargan testified that the only sexual activities which occurred were two acts of oral copulation. The condom is significant because it supports complainant's testimony and simultaneously undermines defendants' claimed version of the night's events. While Yeargan was not given the opportunity to explain away the condom, and Thompson did not testify at all in this case, the presence of the condom corroborates complainant's testimony.

Notwithstanding the presence of the condom and its evidentiary value, however, we believe that it alone cannot compel affirmance especially where the other physical evidence in the record and the unexplained absence of other physical evidence which should be present compels reversal with equal fervor.

For example, complainant testified that she was physically restrained in the alley, that her clothing was forcibly removed, and that she was then sexually assaulted numerous times. No physical evidence exists to support this testimony: neither her clothing was torn in any manner nor did her person exhibit signs of physical abuse. The absence of this evidence would suggest that the night's events occurred consensually as defendants urge. See *People v. Wright* (1986), 147 Ill. App. 3d 302, 321, 497 N.E.2d 1261, 1273 (rape conviction reversed where, *inter alia*, complainant's claim of physical confrontation not corroborated by expected presence of torn clothing or physical harm to person); *People v. Green* (1986), 140 Ill. App. 3d 35, 40-41, 487 N.E.2d 1270, 1274 (rape conviction reversed where, *inter alia*, little corroborative medical evidence existed).

Complainant also testified that she lacked an ordinary vaginal opening and instead had a smaller, urethral opening. Although complainant testified to numerous occurrences of sexual intercourse, the

lack of injury to her person belies her testimony. (See *People v. Anderson* (1974), 20 Ill. App. 3d 840, 850, 314 N.E.2d 651, 657 (rape conviction reversed where, *inter alia,* no medical evidence corroborated forced vaginal intercourse despite complainant's testimony of being a virgin and that defendant had difficulty achieving full penetration).) Similarly, the fact that no seminal material was found on complainant's person or clothing belies her testimony that numerous ejaculations occurred.

Other physical evidence is worth discussing. Palm prints attributable to Thompson and Yeargan were found on the car located in the garage. While their positioning on the car is not disclosed in the record, their presence substantiates Yeargan's testimony that he leaned against the car while complainant kneeled and performed her services.

Finally, when Thompson was arrested, he was found in possession of complainant's cigarette lighter. Yeargan testified that he, Thompson and complainant walked together smoking Yeargan's marijuana cigarette. Thompson's possession of complainant's lighter, which could have been used to light the cigarette, cannot be seen as inconsistent with defendants' claimed version of the events. See *People v. Green* (1986), 140 Ill. App. 3d 35, 41, 487 N.E.2d 1270, 1274 (defendant not proven guilty beyond a reasonable doubt where, *inter alia,* objective facts were consistent with defendant's account of what happened).

We next focus on numerous and peculiar facts in the record which support defendants' assertion that the night's events transpired as they allege or, alternatively, so undermine complainant's testimony that defendants were not proven guilty beyond a reasonable doubt. Defendants further note that these events make complainant's testimony improbable, unsatisfactory and contrary to the laws of human nature and experience.

We list these events as follows: (1) that complainant, while in fear for her life, and while being followed by two strangers who had just propositioned her, proceeded into a dark alley rather than choosing another, safer alternative; (2) that when accosted, complainant admits she did not cry out or fight back, despite being 5 feet 8 inches tall and weighing 180 pounds, nor did her dog attack or run free; (3) that complainant's testimony requires a court to believe that on a Friday night on Fullerton Avenue, a well-traveled and lit thoroughfare, defendants exited their vehicle and followed a woman with a dog into a dark alley, only to forcibly walk her farther down the alley (rather than assaulting her there) and into an open garage of which they arguably knew nothing; (5) that after the assault, complainant quickly

dressed in the dark from a state of total nudity and followed Yeargan from a short distance as he walked, not fled, back to the same vehicle where complainant initially encountered him; and (6) that between the times of 12:30 a.m. and 1:20 a.m., complainant claims that she left her sister's house, walked to the nearby 7-Eleven Store, shopped, encountered both defendants, walked towards her house, was dragged into the garage where she was sexually assaulted by both defendants in the manner she described, followed Yeargan back to the bar, returned to the garage for her dog, walked to the gas station to telephone the police, and waited there for the police to arrive at 1:20 a.m.

We agree with defendants that the events described above, when taken together, justify a conclusion that complainant's testimony is improbable, unsatisfactory and contrary to the laws of human nature and experience and otherwise create a reasonable doubt in this case. We also believe the above events are remarkably consistent with Yeargan's testimony and support the assertion that the entire evening occurred as defendants claim.

We recognize that, in reviewing the above events, complainant's disability and decreased mental ability cannot be ignored. While no scientific evidence exists to illuminate the nature of complainant's disability, we must recognize it and do consider it in addressing the above events. Moreover, we recognize that complainant offered some testimony to rebut these matters. In this regard, complainant testified that the nearby gas station was closed. All witnesses except Yeargan confirmed this. Complainant also explained that she took the alley route because it was the fastest way home and the way she normally took. As for complainant's decision not to fight back, complainant could have chosen not to fight back or scream because to do so would expose her to greater harm. She also explained that her dog did not attack, although requested, because the dog was too friendly. Moreover, the dog did not flee because complainant stated she did not let go of its leash. As for complainant following Yeargan back to the bar after the assault, this conduct could reflect the desire of an assaulted woman to bring her assailants to justice. Finally, as for the times involved, we note that the distances involved here are short and, therefore, complainant spent relatively little time walking.

Notwithstanding complainant's disability and our attempt to construe the evidence in a light most favorable to the State, we believe the events are *too* consistent with defendants' theory of the case to be lightly dismissed. For example, complainant alleges a physical confrontation and the overbearance of her will, but no independent evidence exists to support it: there was no ripped or torn clothing, no

groceries were spilled, the dog did not attack, complainant did not scream or fight back, and no weapons were brandished. While the absence of one of these matters would not significantly affect complainant's credibility, their presence in great number sheds considerable doubt on her testimony. (See generally *People v. Walker* (1987), 154 Ill. App. 3d 616, 506 N.E.2d 1004; *People v. Wright* (1986), 147 Ill. App. 3d 302, 497 N.E.2d 1261; *People v. Green* (1986), 140 Ill. App. 3d 35, 487 N.E.2d 1270.) More importantly, the events must be recognized as consistent with defendants' claim that no physical confrontation occurred and that only consensual sex took place.

■■ We also agree that some of the above enumerated events are contrary to the laws of human nature and experience. For example, complainant failed to flag down a motorist or take other evasive action; rather, she proceeded into a dark alley. Similarly, complainant would have this court believe that after the assault, she dressed from a state of total nudity, and followed Yeargan as he returned to the vehicle, rather than outright fleeing the scene, and thereafter proceeded to continue drinking socially at other bars. Finally, the time involved also seems somewhat short to accomplish all which complainant claims occurred. Again, while the presence of one or two matters contrary to the laws of human nature and experience would not affect complainant's credibility greatly, their combination significantly undermines her testimony. This is especially true where, as here, defendants claimed version of the events are supported by these same facts and events.

As a final ground to support their sufficiency argument, defendants contend that the number of ejaculations to which plaintiff testified exceed known parameters of sexual prowess. While we express no opinion on the matter of sexual prowess, we do agree that her testimony lacks credibility.

In *People v. Barfield* (1969), 113 Ill. App. 2d 390, 251 N.E.2d 923, one of the reasons the court reversed was because it found highly unlikely the complainant's testimony that the defendant performed six acts of forcible intercourse in 2½ hours. Defendants here contend that, like *Barfield*, complainant's testimony is unbelievable in that Yeargan ejaculated five times and Thompson three or four times within a 15- to 20-minute time span. We agree in theory with defendants' argument.

■■ We initially note that the possible number of ejaculations attributable to each defendant and their location is necessarily limited by the sequence of events complainant described. Thompson was at complainant's front and rear only once. Yeargan was at complainant's

front and rear twice. The maximum ejaculations for each defendant is, therefore, two and four, respectively.

When complainant testified chronologically on direct examination, she stated that while Yeargan ejaculated twice in her mouth and another time in her rectum or bladder, Thompson ejaculated once in her mouth. The testimony containing the higher number of ejaculations occurred during cross-examination and, to complainant's credit, is perhaps attributable to complainant's disability and defense counsel's questioning.

For example, on cross-examination by Thompson's counsel, counsel suddenly changed the subject matter of the questioning and asked a "yes" or "no" question containing a higher number of ejaculations. Thompson's counsel asked:

"Q. Tracey, isn't true that you testified that Mr. Thompson ejaculated in your mouth twice?

A. Yes, sir.

Q. Isn't true that you testified that Mr. Yeargan ejaculated in your mouth four times.

A. Three and I didn't say—."

Clearly, counsel misquotes complainant's direct testimony. As noted, Thompson could not have ejaculated twice in complainant's mouth when he was only there once. The same can be said for Yeargan; he could have only ejaculated in complainant's mouth twice as he was there only that number of times. Finally, and again to complainant's credit, she qualified her earlier, direct testimony by saying she could not tell whether Thompson had ejaculated in her rectum or bladder because he wore a condom.

Applying this same analysis to complainant's testimony during Yeargan's cross-examination, the higher number of ejaculations is similarly reduced. For example, as the earlier quoted testimony shows, counsel predicated his questioning of complainant on Yeargan being at her front for the third time when he could only have been there twice. Additionally, during this cross-examination, complainant similarly qualified her earlier testimony by saying that, "as far as [she] knew," Yeargan ejaculated in her rectum or bladder the first time he was behind her. It is worth noting that Yeargan's counsel's questioning ultimately confused complainant, and the court ordered that a new line of questioning be pursued.

The point of the above analysis is to review carefully complainant's testimony and fulfill our duty of taking complainant's testimony in the light most favorable to the State. However, even upon completion of this task, we believe that the situation in *Barfield* has again

presented itself. Even when complainant's testimony is given every benefit, complainant still has Yeargan ejaculating twice in her mouth, once in her rectum or bladder, and perhaps one more time in those locations. This all occurred in a matter of 15 to 20 minutes. While no expert testimony was presented on this point, complainant's testimony on this matter fuels the reasonable doubt fire even more. To be sure, the problem *Barfield* found with the complaining witness' testimony there is present here.

In addition to the sexual scenario complainant described running afoul *Barfield*, we find it difficult to believe complainant's testimony that she was repeatedly subjected to simultaneous frontal and rear assaults while on her hands and knees. Such an attack, while possible in theory, is inherently incredible in light of known human physical capabilities. We also note that complainant's version of who attacked her first was different when she spoke with Officer Jezioro and Detective Arpaia immediately after the alleged attack. At trial, complainant testified that Yeargan was at her front first; on the other hand, complainant told the officers that Thompson was at her front first.

In summary, this case turned on the credibility of two witnesses, complainant and Yeargan. We recognize the circuit court's superior position in resolving the credibility of the witnesses. We also recognize that complainant is disabled, and the court was in a much better position than this court to view the evidence in light of complainant's disability. Finally, we recognize that the record upon which our analysis and conclusions are based is quite cold. Nevertheless, we believe defendants were not proven guilty beyond a reasonable doubt. Too many facts and circumstances in the record undermine complainant's credibility. Too many facts and circumstances are consistent with Yeargan's testimony. Additionally, a motive to lie is present if defendants did indeed fail to pay for complainant's services upon their completion.

For the foregoing reasons, we find the evidence to be so unsatisfactory that no rational trier of fact could have found the defendants guilty beyond a reasonable doubt. Accordingly, defendants' convictions and sentences are reversed.

For the foregoing reasons, the judgments of the circuit court of Cook County are reversed.

Reversed.

CAMPBELL and O'CONNOR, JJ., concur.